## COMMONWEALTH *vs.* JOHN D. GONSALVES.

Plymouth. April 5, 1999. - June 14, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry. *Threshold Police Inquiry. Constitutional Law,* Search and seizure. *Controlled Substances.*

This court declined to adopt the holdings of *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977), and *Maryland* v. *Wilson*, 519 U.S. 408, 415 (1997), concluding that art. 14 of the Declaration of Rights of the Massachusetts Constitution requires that a police officer, in a routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver or passengers out of a motor vehicle. [662-665, 668] IRELAND, J., concurring. FRIED, J., with whom LYNCH, J., joined, dissenting.

A Superior Court judge correctly concluded that, in the circumstances of a police officer's lawful stop of a motor vehicle, there was no reasonable basis for the officer to have ordered the rear seat passenger to step out of the vehicle; consequently, items in plain view on the rear seat, seized after the passenger got out and had been "secured," were correctly suppressed. [668-669] Ireland, J., concurring. FRIED, J., with whom LYNCH, J., joined, dissenting.

INDICTMENT found and returned in the Superior Court Department on May 27, 1997.

A pretrial motion to suppress evidence was heard by *Patrick F. Brady*, J.

An application for an interlocutory appeal was allowed by *Greaney*, J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported to the Appeals Court by him. After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further review.

*John E. Bradley*, Assistant District Attorney, for the Commonwealth.

*J. Drew Segadelli (Janet S. Stateman* with him) for the defendant.

GREANEY, J. The defendant is charged with trafficking in cocaine in violation of G. L. c. 94C, § 32E (*b*). The cocaine was seized by a State trooper, who, while on routine traffic patrol at about 9 P.M. on March 5, 1997, stopped a taxicab on Route 195 near Marion, after he had seen the taxicab drift over

a marked lane into the breakdown lane. In the course of the stop, the trooper ordered the defendant, who was sitting in the rear of the taxi, to get out. After conversing with the defendant, the trooper searched the rear seat area and seized a package of cocaine weighing approximately seventy-eight grams. A judge in the Superior Court allowed the defendant's motion to suppress both the cocaine and his statements because the trooper had "no objective basis upon which to order the defendant out of the vehicle."[1] The Appeals Court affirmed the suppression order, relying on our case law under art. 14 of the Declaration of Rights of the Massachusetts Constitution, concluding, as did the Superior Court judge, that the trooper had no reasonable basis to support his order to the defendant to step out of the taxicab. *Commonwealth* v. *Gonsalves*, 46 Mass. App. Ct. 186 (1999). The Appeals Court rejected the Commonwealth's request that our law should be changed to conform to *Maryland* v. *Wilson*, 519 U.S. 408, 415 (1997), which holds that a police officer does not violate the Fourth Amendment to the United States Constitution, when the officer, in a routine traffic stop, orders a passenger out of the vehicle. *Commonwealth* v. *Gonsalves*, *supra* at 187. We granted the Commonwealth's application for further appellate review to consider the Commonwealth's request. We are not persuaded that we should change our law developed under art. 14.

Based on the evidence that he found credible, the judge made findings of fact. We accept those facts, see *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538 (1990), and now summarize them. When the State trooper observed the taxicab traveling partly in the breakdown lane of the highway which he was patrolling, he became concerned that the driver might be under the influence of an intoxicant, and signaled for the driver to stop. The trooper approached the stopped taxicab, spoke to the driver, and noted that there were also two passengers in the car, including the defendant, who was the sole occupant of the back seat. The trooper took the taxicab driver's license and registration. He questioned the driver about his driving over the marked

---

[1]In reaching this conclusion, the judge expressly relied on *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997), which is based exclusively on art. 14 of the Declaration of Rights of the Massachusetts Constitution. The Commonwealth makes no argument that the defendant did not raise art. 14 as the only ground on which he could obtain the relief he sought in his motion to suppress.

lane, and the driver told the trooper that he had trouble with his night vision. In the course of questioning the driver, the trooper trained his flashlight on the occupants of the car, something which he routinely did on such stops for his personal safety. The trooper thought the defendant was extremely nervous. His hands were trembling and moving from his lap to the seat and back to his lap again, and he appeared to be breathing heavily. Because the defendant appeared nervous, the trooper ordered him to step out of the taxicab. The defendant complied, and the trooper conducted a patfrisk, which revealed nothing. He asked the defendant why he was nervous, and the defendant replied that there were warrants outstanding against him for driving without a license. At that point, the trooper "secured" the defendant in the rear seat of the police cruiser. He obtained permission from the driver of the taxicab to search the vehicle's back seat, where the trooper saw a portion of a plastic bag protruding from between the seat cushion and the seat back. The plastic bag contained white powder which the trooper suspected was cocaine.

The trooper returned to the cruiser, recited the Miranda rights to the defendant, and questioned him. The defendant denied knowledge of the plastic bag or any cocaine. After citing the taxicab driver for a marked lane violation, the trooper allowed the taxicab to leave. He then took the defendant to the Bourne barracks for further questioning. At first, the defendant continued to deny any knowledge of the bag of white powder, which weighed approximately seventy-eight grams, but, eventually, he made inculpatory statements in the trooper's presence.

1. In *Pennsylvania* v. *Mimms*, 434 U.S. 106, 111 (1977), the United States Supreme Court held that a police officer may, as matter of course, order a driver out of a vehicle that has been lawfully stopped for a traffic violation. In *Maryland* v. *Wilson*, *supra* at 415, the Court extended that rule to approve similar orders given to passengers in a stopped vehicle.[2] The Commonwealth argues that we have "consistently purported to follow *Mimms*." It relies on *Commonwealth* v. *Santana*, 420 Mass. 205, 212-213 (1995), for this statement, while acknowledging,

---

[2]In *Knowles* v. *Iowa*, 119 S. Ct. 484 (1998), the United States Supreme Court appears to have drawn the line on what may be done by the police in a routine traffic stop. There the Court held that a police officer who had made such a stop and cited the driver for speeding could not thereafter conduct a "full field-type search" of the vehicle. *Id.* at 488.

as it must, that *Santana* contains language which "squarely cuts against the [the United States Supreme] Court's holding in *Mimms*." Nonetheless, the Commonwealth argues that we should now expressly embrace *Mimms*, and its corollary, the ruling in *Wilson*, and make plain that our art. 14 case law coincides with the *Mimms-Wilson* holdings under the Fourth Amendment.

We have not adopted *Mimms*.

> "It is true that cases from [the Appeals Court] and the Supreme Judicial Court have cited approvingly to *Mimms*, without expressly stating that the police are not entitled to carte blanche authority to order drivers out of their vehicles. See, e.g., *Commonwealth* v. *Ferrara*, 376 Mass. 502, 505 (1978); *Commonwealth* v. *Robbins*, 407 Mass. 147, 151 (1990); *Commonwealth* v. *Moses*, 408 Mass. 136, 142 (1990); *Commonwealth* v. *Lantigua*, 38 Mass. App. Ct. 526, 528-529 (1995).

> "However, a closer examination of these cases reveals that while explicit language requiring a 'reasonable suspicion' has not appeared, each case explored the factual basis for the officer's suspicion. See *Commonwealth* v. *Ferrara*, 376 Mass. at 505 (finding no basis for further interrogation and no need for further protective precautions, and reversing order denying motion to suppress); *Commonwealth* v. *Robbins*, 407 Mass. at 152 (police officer's actions proper where officer saw brown-handled object wedged in passenger seat and driver had just been arrested on outstanding warrant); *Commonwealth* v. *Moses*, 408 Mass. at 138, 141-143 (police officer's actions proper where officer feared defendants had access to a weapon, was outnumbered by defendants, and one defendant, upon making eye contact with the officer, ducked under dashboard)."

*Commonwealth* v. *Williams*, 46 Mass. App. Ct. 181, 183-184 (1999). As the *Williams* opinion goes on to point out, what was implicit in the decisions just referred to, was made explicit in *Commonwealth* v. *Santana, supra*, where we stated that "[t]o determine whether [an exit] order was justified, we ask 'whether a reasonably prudent man in the policeman's position would be warranted in the belief that the safety of the police or that of other persons was in danger.' " *Commonwealth* v. *Santana, supra* at 212-213, quoting *Commonwealth* v. *Almeida*, 373 Mass.

266, 271 (1977). This statement in *Santana* was reiterated two years later in *Commonwealth* v. *Vazquez*, 426 Mass. 99, 102-103 (1997). Thus, the rule that a police officer must, at least, have a reasonable suspicion of danger before compelling a driver to leave his motor vehicle has been affirmed by this court well after the United States Supreme Court abandoned that requirement in *Mimms*. Because we have departed from the Federal view of a citizen's Fourth Amendment rights in the area, our long-standing rule expresses a principle of State constitutional law under art. 14.

We have expressly granted other protections to drivers and occupants of motor vehicles under art. 14 in a variety of areas, and we have done so to guarantee protections that, in some cases, may not be recognized under the Fourth Amendment. See *Commonwealth* v. *Torres*, 424 Mass. 153, 154-155, 157-164 (1997) (that passenger left vehicle, without being asked to do so, on routine traffic stop provides no basis to further detain driver and passenger after issuing speeding ticket); *Commonwealth* v. *King*, 389 Mass. 233, 244 (1983) (once officer, making valid investigatory check of parked car at rest area, verified driver's and passenger's licenses and vehicle registration, no grounds existed for further investigation or precautions); *Commonwealth* v. *Loughlin*, 385 Mass. 60, 61-63 & n.3 (1982) (search conducted after justifiable threshold inquiry wherein driver produced valid license and registration held impermissible); *Commonwealth* v. *Ferrara*, *supra* at 504-505 (no basis to interrogate passengers after driver produced valid license and registration); *Commonwealth* v. *Alvarez*, 44 Mass. App. Ct. 531, 534 (1998) (during routine stop for traffic violation, officer may not ask for passenger's identification as matter of "routine practice"); *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 556-557 (1996) (after officer, having stopped driver for erratic driving, determined that there was no traffic offense and driver had produced valid license and registration, he had no reason to issue exit orders to passengers, in spite of earlier furtive movements of one passenger); *Commonwealth* v. *Kimball*, 37 Mass. App. Ct. 604, 607 (1994) (during stop on suspicion that car was stolen, once driver produced valid license and registration, he should have been permitted to leave). In view of these protections, and the principles expressed in the *Santana* decision, which were repeated in the *Vazquez* decision, we conclude that art. 14 requires that a police officer, in a

routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver out of a motor vehicle. The fact that we do not follow *Mimms* in this type of case necessarily leads to the conclusion that we shall not follow *Wilson* either, because *Wilson* extends *Mimms* in a manner incompatible with the rights guaranteed Massachusetts citizens under art. 14.

2. We now explain our reasons for reaching these conclusions and comment on some matters raised by the dissenting opinion in this case. A routine traffic stop, like the one in this case, presents a situation where citizens, both the vehicle's driver and any passenger or passengers in the vehicle, expect a police officer to get the government's business done quickly, so those detained can go on their way. This expectation is a reasonable one. A passenger in the stopped vehicle may harbor a special concern about the officer's conduct because the passenger usually had nothing to do with the operation, or condition, of the vehicle which drew the officer's attention in the first place. Citizens do not expect that police officers handling a routine traffic violation will engage, in the absence of justification, in stalling tactics, obfuscation, strained conversation, or unjustified exit orders, to prolong the seizure in the hope that, sooner or later, the stop might yield up some evidence of an arrestable crime. That a small percentage of routine traffic stops may result in the detection of more serious crime is no reason to subject the vast majority of citizens to orders to get out of their vehicles.

Such an intrusion into a driver or a passenger's privacy is not minimal. As was expressed by a dissent in *Mimms*, "[a] woman stopped at night may fear for her own safety; a person in poor health may object to standing in the cold or rain; another who left home in haste to drive children or spouse to school or to the train may not be fully dressed; an elderly driver who presents no possible threat of violence may regard the police command as nothing more than an arrogant and unnecessary display of authority." *Pennsylvania* v. *Mimms, supra* at 120-121 (Stevens, J., dissenting). Routine traffic stops may also pose unique hardships on minorities who, it has been argued, are often the subject of stops on pretext. See Harris, "Driving While Black" and All Other Traffic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J. Crim. L. & Criminology 544 (1997); Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth

Amendment, 1997 Sup. Ct. Rev. 271. Justice Ireland's concurring opinion, with which we agree, makes this point more expansively. *Post* at 669-671. The rules in *Mimms* and *Wilson,* which permit automobile exit orders during any traffic stop, but which do not require that such orders be given, are a clear invitation to discriminatory enforcement of the rule.[3]

"*Mimms* [and *Wilson*] rested on the logic, which we do not contest, that there is danger for a police officer inherent in any auto stop. *Mimms,* 434 U.S. at 110, 111. However, to permit an officer, in the absence of any specific and articulable facts, to order the driver of a vehicle [and a passenger or passengers] to step out of the vehicle would be to invite random and unequal treatment of motorists. See *Commonwealth* v. *Bartlett,* 41 Mass. App. Ct. 468, 472 (1996) ('[t]he vice in interrogations and searches based on a hunch is their essentially random and arbitrary nature, a quality inconsistent, under constitutional norms . . . with a free and ordered society')." *Commonwealth* v. *Williams, supra* at 183. The safety of the police can be adequately protected. While a mere hunch is not enough, see *Commonwealth* v. *Silva,* 366 Mass. 402, 406 (1974), it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order. See *Commonwealth* v. *Johnson,* 413 Mass. 598, 600, 601 (1992) (driver put something inside his waistband after trying to evade police); *Commonwealth* v. *Almeida,* 373 Mass. 266, 271-272 (1977) (driver failed to produce registration in high crime area, late at night, and carefully opened console just high enough when retrieving wallet); *Commonwealth* v. *Prevost,* 44 Mass. App. Ct. 398, 399 (1998) (passenger bent out of officer's sight and attempted to put on his coat as if to conceal something); *Commonwealth* v. *Heughan,* 40 Mass. App. Ct. 102, 104-105 (1996) (as driver pulled over, back seat passenger bent down as if replacing or retrieving object under front seat); *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. 311, 314-315 (1992) (driver had no license, police officer outnumbered, aluminum bat under front passenger seat, back seat passenger holding object large enough to conceal weapon); *Commonwealth* v. *Vanderlinde,* 27

---

[3]The United States Supreme Court, in *New York* v. *Class,* 475 U.S. 106, 115 (1986), recognized that "[k]eeping the driver of a vehicle *in* the car during a routine traffic stop is probably the typical police practice. See D. Schultz & D. Hunt, Traffic Investigation and Enforcement 17 (1983)." (Emphasis added.)

Mass. App. Ct. 1103, 1104 (1989) (driver had tried to evade capture and passenger reached into well between the front seats during the stop). See also *State* v. *Smith*, 134 N.J. 599, 618 (1994) ("To support an order to a passenger to alight from a vehicle stopped for a traffic violation, therefore, the officer need not point to specific facts that the occupants are 'armed and dangerous.' Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car"). It could be argued plausibly that automatic exit orders might increase the chance of confrontation when already upset citizens are compelled to stand outside a vehicle while a police officer disposes of the minor traffic violation, especially if circumstances indicate that the officer's conduct may be a pretext.[4]

The rule we adopt also provides that the police will act in a reasoned way. As Justice Kennedy stated in his dissent in *Wilson*: "The distinguishing feature of our criminal justice system is its insistence on principled, accountable decisionmaking in individual cases." *Maryland* v. *Wilson, supra* at 422 (Kennedy, J., dissenting). Bright-line rules, by their nature, tend to eliminate this feature. They should be allowed only in those circumstances where safety concerns clearly outweigh the intrusion on individual rights.[5] Police work is fast-paced, can be dangerous at times, and requires understanding of a broad set of

---

[4]We question the assumption that asking a person at a traffic stop to get out of the car will be safer than keeping the person in the car. As Justice Stevens pointed out in his dissent in the *Wilson* case, there is no empirical evidence supporting this contention, and the available "statistics are as consistent with the hypothesis that ordering passengers to get out of a vehicle increases the danger of assault as with the hypothesis that it reduces that risk." *Maryland* v. *Wilson*, 519 U.S. 408, 417 (1997) (Stevens, J., dissenting). Professor LaFave, in 4 W. LaFave, Search and Seizure § 9.5, at 44 (Supp. 1999), notes the absence of empirical evidence that, as a class, passengers in automobiles whose drivers have committed a traffic violation have a propensity to violence.

[5]Bright-line rules also undermine the Fourth Amendment's underlying touchstone of reasonableness. See LaFave, *supra* at 44. See also Dery, Sanctioning "Thousands Upon Thousands of Petty Indignities": The Supreme Court's Creation of a Constitutional Free Zone for Police Seizure of Innocent Passengers in Maryland v. Wilson, 54 Wash. & Lee L. Rev. 1419 (1997); Harris, Car Wars: The Fourth Amendment's Death on the Highway, 66 Geo. Wash. L. Rev. 556 (1998); Harris, "Driving While Black" and All Other Traf-

rules in order to ensure that the rights of citizens are upheld. The dissent in this case calls for a bright-line rule in order to ease some of the complexity police officers face in the line of duty, equating the *Mimms-Wilson* rule to the automatic patfrisk that may accompany a lawful *Terry* stop.[6] *Post* at 676-678. The two situations are not analogous, and the difference between them demonstrates why the *Mimms-Wilson* rule should not be adopted.

Under *Terry*, a police officer is permitted to pat frisk a person stopped under suspicion of criminal activity where the police officer has reason to believe he is dealing with an armed and dangerous individual. See *Terry* v. *Ohio*, 392 U.S. 1, 24-25 (1968). Under *Mimms-Wilson*, a police officer is permitted to issue exit orders to a person stopped for a traffic infraction when the officer has no reason to suspect anything. It is more consistent with the *Terry* rule, as well as with the circumstances in which we have been willing to create bright-line rules, to require some objective circumstances making it reasonable to issue an exit order to the driver or passengers in a stopped vehicle. We believe that "[i]t does no disservice to police officers . . . to insist upon exercise of reasoned judgment" in this kind of case. *Maryland* v. *Wilson, supra* at 423 (Kennedy, J., dissenting).

The dissent in this case refers to forty-five States which it asserts have accepted *Mimms* or *Wilson* or both. This assertion should be looked at with a skeptical eye. While we agree that twenty-two States have considered *Mimms*, and in some instances *Wilson*, and accepted the rules in these decisions as a matter of State constitutional law or policy,[7] twenty-two States have not expressly considered the issues in *Mimms* or *Wilson*

fic Offenses: The Supreme Court and Pretextual Traffic Stops, 87 J. Crim. L. & Criminology 544 (1997); Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup. Ct. Rev. 271. To the extent that a bright-line rule is needed, our conclusions today establish one: No exit order may be given to the driver or any passenger in a routine traffic stop without the police officer's having an objective reasonable basis to justify the order.

[6]*Terry* v. *Ohio*, 392 U.S. 1, 23-26 (1968).

[7]Two of these States, California and Florida, had no choice in the matter because of amendments to their State Constitutions which require interpretations consistent with those of the United States Supreme Court in its construction of the Fourth Amendment. The other States are Colorado, Connecticut, Idaho, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, New Jersey,

under their State Constitutions.[8] Three States have rejected *Mimms* or *Wilson* on State constitutional grounds.[9,10]

We also point out other relevant considerations. The Declaration of Rights was adopted in 1780, as part of the Massachusetts Constitution, some seven years before the United States Constitution was approved. The Declaration of Rights was written in the historical context of the abuses of governmental power inflicted on the colonists by British officials, and art. 14

New York, North Carolina, North Dakota, Ohio, Pennsylvania, Rhode Island, South Dakota, Texas, Virginia, and Wisconsin.

While Iowa has not considered *Mimms*, it has upheld, under the State Constitution, a statute authorizing searches incident to traffic citations, making rejection of *Mimms-Wilson* unlikely. *State v. Doran*, 563 N.W.2d 620 (Iowa 1997).

[8] These States either have not decided the issues, have decided the issues after considering only Fourth Amendment arguments, or have done so with no citation to State constitutional authority. The States are Alabama; Arizona (but see *State v. Webster*, 170 Ariz. 372, 374-375 [Ct. App. 1991] [Livermore, C.J., dissenting] [citing *Mimms*, majority upholds police officer's order that passenger get back into vehicle on traffic stop, dissent argues that seizure of passengers requires individual justification]); Arkansas; Delaware; Georgia; Kansas; Maine; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Hampshire; New Mexico; Oklahoma; South Carolina; Tennessee; West Virginia; Wyoming (but see *Goettl v. State*, 842 P.2d 549, 558, 569-575 [Wyo. 1992] [Urbigkit, J., dissenting] [urging continued independent review under the Wyoming Constitution of search and seizure questions, noting, for example, that in Wyoming passengers in motor vehicles have a legitimate expectation of privacy]).

Two of the States have expressly stated an interest in considering *Mimms* or *Wilson* on State constitutional grounds. These States are Alaska, State *vs.* Wystrach, No. A-6158 (Alaska Ct. App. May 28, 1997) (the court has not had "the opportunity to consider whether the Alaska Constitution requires a different rule"); Utah, *State v. Shepard*, 955 P.2d 352, 357 n.1 (Utah Ct. App. 1998) (court accepts holding in *Wilson*, "until the Utah Supreme Court decides otherwise under the Utah Constitution").

[9] These States are as follows: Hawaii, *State v. Kim*, 68 Haw. 286, 287-288 (1985) (rejecting *Mimms*); Vermont, *State v. Caron*, 155 Vt. 492, 500-501 (1990) (court upholds exit order on the basis that police had reasonable suspicion that person stopped was armed and dangerous), and *State v. Jewett*, 148 Vt. 324, 330 (1987) (under Vermont Constitution, justified exit order on the basis that police had reasonable suspicion that individual was driving while under the influence of alcohol, and that ordering occupant out of the vehicle may "confirm or negate . . . suspicions regarding probable cause to arrest"); Washington, *State v. Mendez*, 137 Wash. 2d 208, 220 (1999) (affirming acceptance of *Mimms* under Washington Constitution, explicitly refusing to extend to passengers).

[10] The situation in Michigan and Oregon is unclear and we have not included these States in any category.

was directed at the unlawful invasion of privacy rights by those officials. That the drafters of the Fourth Amendment subsequently chose to replicate the words used in art. 14 cannot support a conclusion that we are compelled to act in lockstep with the United States Supreme Court when it interprets that amendment. Such a conclusion posits a serious misunderstanding of the authority of this court to interpret and enforce the various provisions of the Massachusetts Constitution, particularly those in the area of civil liberties. Chief Justice Wilkins has stated that, "the [United States] Supreme Court . . . describ[es] a common base from which we can go up," but the Justices of this court "are, however, entitled to [their] own views, indeed constitutionally required to have them." Remarks of Chief Justice Herbert P. Wilkins to Students at New England School of Law on March 27, 1997, 31 New England L. Rev. 1205, 1213 (1997). The nature of federalism requires that State Supreme Courts and State Constitutions be strong and independent repositories of authority in order to protect the rights of their citizens.

The foregoing discussion explains the foundation of our rule that, once a stopped driver has produced the necessary papers and they are found to be in order, he and his passengers are to be promptly released, *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997), and why we choose not to follow *Mimms-Wilson*. We, of course, respect the United States Supreme Court's judgment in the matter under the Fourth Amendment. That judgment was reached after balancing the interests of the police against the liberty interests of citizens, with the Court concluding that the former should prevail over the latter. For the reasons stated, we conclude that, under art. 14, the balancing of interests requires that Massachusetts citizens should not be subjected to unjustified exit orders during routine traffic stops.

3. We reject the Commonwealth's arguments that the judge based his ruling on an erroneous interpretation of the timing of the officer's exit orders, or, alternatively, that the judge erred in finding no reasonable basis for the actions of the trooper. It was not the timing of the trooper's actions, but the insufficient reasons for the actions, on which the judge based his decision. We agree with the analysis made by the Superior Court judge and the Appeals Court in considering whether the trooper had a basis to order the defendant out of the taxi. Where, as here, the evidence consists solely of oral testimony, the determination of the weight and credibility of the testimony is the responsibility

of the judge. We accept his subsidiary findings of fact and his decision that nervousness and fidgeting do not warrant what occurred here.[11] *Commonwealth* v. *Colon-Cruz*, 408 Mass. 533, 538 (1990).

*Order allowing motion to suppress affirmed.*

IRELAND, J. (concurring). I join in the opinion of the court and fully agree with its conclusion that, in the context of automobile exit orders, art. 14 of the Declaration of Rights of our State Constitution provides greater protection to Massachusetts citizens than the United States Constitution. As we were once reminded, "The right question . . . is not whether a state's guarantee is the same as or broader than its federal counterpart as interpreted by the Supreme Court. The right question is what the state's guarantee means and how it applies to the case at hand." *Massachusetts* v. *Upton*, 466 U.S. 727, 738 (1984) (Stevens, J., concurring), quoting Linde, E Pluribus — Constitutional Theory and State Courts, 18 Ga. L. Rev. 165, 179 (1984).

I write separately, however, to stress the dangers posed by unfettered police power to order individuals out of automobiles without any justification. The grant of such power is certainly, as the majority notes, "a clear invitation to discriminatory enforcement of the rule." *Ante* at 664. This is precisely the type of power "that art. 14 was adopted to guard against," *Commonwealth* v. *Blood*, 400 Mass. 61, 71 (1987), because, in the words of James Otis, it " 'places the liberty of every man in the hands of every petty officer.' " *Commonwealth* v. *Cundriff*, 382 Mass. 137, 144 (1980), cert. denied, 451 U.S. 973 (1981), quoting 2 Legal Papers of John Adams (L. Wroth & H. Zobel eds. 1965).

---

[11]It is implicit in the judge's findings of fact that he rejected the trooper's testimony that the defendant's nervousness and hand motions provided him with an objectively reasonable fear for his safety. In his findings of fact, the judge said, "Because the defendant appeared to be nervous, [the] trooper . . . ordered him to exit the vehicle." In discussing his reasons for allowing the defendant's motion to suppress the evidence gathered as a result of the search, the judge said, "No gesture or conduct indicated the presence of a weapon on defendant's person or in his immediate vicinity. Although certainly the trooper had every right to be careful for his own safety, he had no objective basis upon which to order the defendant out of the vehicle and to continue his investigation. The trooper was simply following a 'hunch'. . . ."

The widespread public concerns about police profiling, commonly referred to as "DWB — driving while black," has been the subject of much discussion and debate both across the country and within the Commonwealth. See Black Drivers Describe Harassment by Police, The Boston Globe, Apr. 13, 1999, at A1. Statistics show that such racial profiling occurs throughout the nation. "In Florida, police documented 1,100 videotaped stops along Interstate 95 in the late 1980's. While blacks and Hispanics made up just 5 percent of the drivers, they made up eighty percent of those stopped and searched." Traffic Stops Discounted in Sentencing, The Washington Post, Dec. 17, 1998, at A8. One study found that seventy-three per cent of cars stopped and searched on Interstate 95 in Maryland were driven by black people, while only fourteen per cent of people who use the road are black. Seat Belt Push Raises Race Issue; Blacks Weigh Tolls of Safety vs. Bias, The Washington Post, Apr. 3, 1998, at A1. In addition, statistics presented to the United States House of Representatives indicate that "blacks, who make up about 14 percent of the population, account for 72 percent of drivers pulled over for routine traffic stops." House OKs Study of Car Searches, The Boston Globe, Mar. 25, 1998, at A12.

Indeed, the New Jersey Attorney General's office has recently admitted that such racial profiling in traffic stops is "real, not imagined." Bradley Puts Race at Center Of Campaign, The Star-Ledger (Newark, N.J.), Apr. 21, 1999, at 8. "Of the stops examined by the [New Jersey] Attorney General's Office, roughly 60 percent involved white drivers, 27 percent blacks, 7 percent Hispanics, and 4 percent Asians. Few of those stops[,] less than 1 percent[,] resulted in searches. But when they did, 77 percent of the searches involved blacks or Hispanics. Only 21 percent of the searches involved whites." Belated Acknowledgment an Essential First Step To Ending Racial Profiling, The Record (Northern N.J.), Apr. 22, 1999, at L8.

Other courts have also recognized racial profiling and "DWB" as a real cause for concern. See *United States* v. *Leviner*, 31 F. Supp. 2d 23, 33 (D. Mass. 1998); *State* v. *Valentine*, 132 Wash. 2d 1, 28 n.1 (1997) (Sanders, J., dissenting).

As the court's opinion indicates, *ante* at 663-664, the rules in *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), and *Maryland* v. *Wilson*, 519 U.S. 408 (1997), which permit automobile exit orders during any traffic stop "may also pose unique hardships on minorities" and could be a "clear invitation to discrimina-

tory enforcement." Prohibiting the police from ordering people out of automobiles without any justification is a much needed step in the right direction to cure such abuses.

FRIED, J. (dissenting, with whom Lynch, J., joins). Twenty-two years ago the Supreme Court of the United States announced a rule intended better to assure the safety of police officers against the sometimes lethal dangers of routine traffic stops. Today the court, invoking the Constitution of this State, rejects that rule. Virtually every other State has accepted the Supreme Court's rule. Indeed, until today we too had always cited the Supreme Court's rule with approval. Because I believe today's decision to be unwarranted in principle and unwise in policy, I respectfully dissent.

## I

In *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), the Supreme Court ruled that the Fourth Amendment to the United States Constitution is not offended by the practice of ordering, as a matter of course, the driver of a vehicle lawfully stopped to step outside the vehicle while the necessary inquiries connected with that stop are conducted. There were three dissenters at that time. The Court has not deviated from that rule. Two years ago in *Maryland* v. *Wilson*, 519 U.S. 408 (1997), a wide spectrum of Justices (Rehnquist, C.J., and O'Connor, Scalia, Thomas, Souter, Ginsburg, and Breyer, JJ.) extended that rule to the passenger of the vehicle. There were only two dissenters. The Court's reasoning in *Mimms* is worth setting out at length:

> "The State freely concedes the officer had no reason to suspect foul play from the particular driver at the time of the stop, there having been nothing unusual or suspicious about his behavior. It was apparently his practice to order all drivers out of their vehicles as a matter of course whenever they had been stopped for a traffic violation. The State argues that this practice was adopted as a precautionary measure to afford a degree of protection to the officer and that it may be justified on that ground. Establishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements; this, in turn, reduces the likelihood that the officer will be the victim of an assault.

> "We think it too plain for argument that the State's

proffered justification — the safety of the officer — is both legitimate and weighty. 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' *Terry* v. *Ohio*, [392 U.S. 1, 23 (1968)]. And we have specifically recognized the inordinate risk confronting an officer as he approaches a person seated in an automobile. 'According to one study, approximately 30% of police shootings occurred when a police officer approached a suspect seated in an automobile. Bristow, Police Officer Shootings — A Tactical Evaluation, 54 J. Crim. L.C. & P.S. 93 (1963).' *Adams* v. *Williams*, 407 U.S. 143, 148 n.3 (1972). We are aware that not all these assaults occur when issuing traffic summons, but we have before expressly declined to accept the argument that traffic violations necessarily involve less danger to officers than other types of confrontations. *United States* v. *Robinson*, 414 U.S. 218, 234 (1973). Indeed, it appears 'that a significant percentage of murders of police officers occurs when the officers are making traffic stops.' *Id.*, at 234, n.5.

"The hazard of accidental injury from passing traffic to an officer standing on the driver's side of the vehicle may also be appreciable in some situations. Rather than conversing while standing exposed to moving traffic, the officer prudently may prefer to ask the driver of the vehicle to step out of the car and off onto the shoulder of the road where the inquiry may be pursued with greater safety to both." (Footnote omitted.)

*Id.* at 109-111. In extending that rule to passengers in *Wilson,* the Court stated that "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal." *Wilson, supra* at 414-415. One cannot insist too much on the statistics cited by the Court showing the number of fatal killings of police officers in connection with traffic stops, including routine traffic stops. Since *Mimms* was decided, at least two police officers in this Commonwealth have been murdered in connection with traffic stops. See *Boston Herald* v. *Superior Court*, 421 Mass. 502 (1995); *Commonwealth* v.

*Colon-Cruz,* 408 Mass. 533 (1990).[1] The court today waves aside the substantial evidence of this mortal danger to our law enforcement officers with only a passing reference to the "danger for a police officer inherent in any auto stop," *ante* at 664, quoting *Commonwealth* v. *Williams,* 46 Mass. App. Ct. 181, 183 (1999), and rejects for the first time a doctrine we have cited with approval ever since it was first established.

## II

The court finds this rejection of the Supreme Court's Fourth Amendment jurisprudence to be compelled by the similarly worded provision of art. 14 of the Massachusetts Declaration of Rights, a provision we have never before cited in this context. There is no such constitutional compulsion. This is a pure judgment of policy, a policy judgment that appeals to a majority of this court, though not to the United States Supreme Court. In the past, when we have declined to follow the Supreme Court in this area of the law, we have pointed to decisions in our

[1]The killing in *Commonwealth* v. *Colon-Cruz,* 408 Mass. 533 (1995), occurred after the perpetrators had already been ordered out of the vehicle during a routine traffic stop. (See, e.g., UPI News Service, May 9, 1985.) The court's emphasis on the location of the shooters misses the point of the *Mimms-Wilson* line of cases. *Mimms* and *Wilson* are not so much about in or out being better (although, as both cases involved exit orders, the court did explain the potential benefits which would animate such an order on the part of the officer), they are about assuring that officers have the ability to take protective measures which amount to only a de minimis intrusion on the occupants' liberty — namely deciding where the officer would prefer the occupants wait — in order to minimize the threat to the officer during these potentially dangerous encounters. I cite to the cases in the accompanying text merely to indicate how real this danger is here in the Commonwealth.

Courts across the nation have realized that the purpose of *Mimms* and *Wilson* is not for courts to decide whether having occupants wait inside or outside the vehicle is safer, rather, it is to allow the experienced officer in the field to make this determination in the particular circumstances present. See, e.g., *State* v. *Webster,* 170 Ariz. 372, 373-374 (Ct. App. 1992) (holding that *Mimms* rule applies equally to both drivers and passengers and even encompasses further order to get back into car); *Borski* v. *State,* 712 So. 2d 787, 788 (Fla. Dist. Ct. App. 1998) (approving of *Mimms-Wilson* rule and holding the rule extends to orders to driver or passenger to remain in the vehicle); *State* v. *Roberts,* 284 Mont. 54 (1997) (citing *Wilson,* holding that an officer, who stopped automobile because he believed arrest warrant existed for driver, did not unlawfully detain passenger by directing him to remain in the vehicle). That the protective measure may sometimes prove insufficient, or even that it may backfire, does not detract from the need to allow the officer in the field the ability to make this determination free from the fear that his actions will later be second-guessed by some court.

sister States to show that ours is not an idiosyncratic or merely personal judgment. See, e.g., *Commonwealth* v. *Stoute*, 422 Mass. 782, 786-789 (1996) (declining to follow *California* v. *Hodari D.*, 499 U.S. 621 [1991]); *Commonwealth* v. *Upton*, 394 Mass. 363, 374 n.10 (1985) (declining to follow *Illinois* v. *Gates*, 463 U.S. 213 [1983]). The court does not do so today, and small wonder. Forty-four States and the District of Columbia have accepted *Mimms* and only one has rejected it on constitutional grounds, as the court does today.[2] See Appendix.[3]

[2]The Supreme Court of Oregon has not ruled on this issue but the Oregon Court of Appeals appears to have rejected the *Mimms* rule on statutory grounds. See *State* v. *Lanig*, 154 Or. App. 665, 667-668 (1998) (citing Or. Rev. Stat. § 810.401[3][b] [1997], which has been construed to limit the course of police action during a stop for a traffic infraction). Not only does this dissent urge that the question be one for legislative determination, but the court's opinion here today preempts such determinations. Moreover, the existence of such a law indicates a belief that, were it not for the law, the contested police action would be permissible under the State as well as the Federal Constitution. See Appendix. Three States have not ruled on the issue. *Id.*

[3]Much of the materials the court cites to draw the teeth of my demonstration that the step it takes today is at odds with the prevailing law across the nation, are either dubiously characterized or beside the point. The court gives some importance to the fact that some of the States that have followed *Mimms* or *Wilson* "have not expressly considered the issues in *Mimms* or *Wilson* under their State Constitutions." *Ante* at 666-667. The contention that the absence of an explicit reference to a provision of the State Constitution indicates a failure of these courts to consider that issue is unconvincing. Both the courts and the defense bar are aware of the existence of State Constitutions and it is unreasonable to suggest that motions to suppress are regularly denied where the State Constitution would require a different result. Even where the State Constitution is not explicitly mentioned, courts often use broad and inclusive language that does not indicate that the decisions are solely contemplating the Fourth Amendment to the United States Constitution. See, e.g., *State* v. *Reynolds*, 753 S.W.2d 1, 2 (Mo. Ct. App. 1988) (denying motion which "alleges that the trial court committed error when it overruled his motion to suppress," because "[o]nce a vehicle is lawfully detained for a traffic violation, a police officer may order the occupants to get out of the vehicle"). Moreover, there is evidence that, even where a majority opinion does not make explicit reference to the State Constitution, the issue is usually brought to the court's attention, just not successfully. *State* v. *Ferrise*, 269 N.W.2d 888, 890, 891 & n.1 (Minn. 1978) (where court extended *Mimms* rule to passengers pre-*Wilson* and dissent argued that there was not "the ample probable cause in this case which is required by the constitutions of both the United States and the State of Minnesota," citing art. 1, § 10, of the Minnesota Constitution); *State* v. *Stubbs*, 270 Mont. 364, 369, 375 (1995) (Trieweiler, J., dissenting) (where court cited *Mimms* with approval and dissent argued that the result did not square with "either the Fourth Amendment to the United States Constitution or Article II, Section 11, of the Montana

And of the twenty-nine jurisdictions to consider whether to

Constitution"); *State* v. *Houghton*, 956 P.2d 363, 366 n.2 (Wyo. 1998), rev'd, 119 S. Ct. 1297 (1999) (not taking issue with automatic exit order despite explaining that art. 1, § 4, of the Wyoming Constitution is "somewhat stronger than its federal counterpart").

Equally misleading is the court's claim that "[t]hree States have rejected *Mimms* or *Wilson* on State constitutional grounds." *Ante* at 667. In fact, only one other court in the entire nation has done what this court does here today. *State* v. *Kim*, 68 Haw. 286, 287-288 (1985), rejected *Mimms* and Hawaii has not given any indication, nor is it likely to, that it would come to a different conclusion regarding passengers in light of *Wilson*. The court claims that Vermont appears not to follow *Mimms*. *Ante* at 667 n.9. But the Vermont cases the court cites cite *Mimms* and do not anywhere disavow its holding. In *State* v. *Jewett*, 148 Vt. 324, 329 (1987), the court was explicitly asked to hold that, "under Chapter I, Article Eleven of the Vermont Constitution police officers may . . . require the suspect to leave his vehicle only if they reasonably suspect the person is armed and dangerous." The court declined to announce any such rule and upheld the exit order and subsequent search. The court found that there was, indeed, probable cause to search the suspect, obviating the need for the court to choose which standard, prosecution's or defense's, to apply as either was met. *Id.* at 330. Cf. *State* v. *Caron*, 155 Vt. 492, 501 (1990). It is also a stretch for the court to cite the Supreme Court of Washington in support of today's holding for, while that court has, indeed, rejected *Wilson*, it has explicitly accepted *Mimms* which the court today also rejects. *State* v. *Mendez*, 137 Wash. 2d 208, 220 (1999).

The court similarly attempts to manufacture indecision where none exists. The court claims that the situation in Michigan is "unclear." *Ante* at 667 n.10. The only basis for such a contention is a case in which an appeals court reversed itself on reconsideration after initially holding that the Michigan Constitution provided greater rights than that afforded by the Supreme Court decision in *Mimms*. *People* v. *Harmelin*, 176 Mich. App. 524, 527 (1989), aff'd, 501 U.S. 957 (1991). But even in its earlier opinion, the court in that case admitted that "other panels of this Court have cited *Mimms* with approbation." *Id.* at 530. In fact, both the Supreme Court of Michigan, *People* v. *Bloyd*, 416 Mich. 538, 552 (1982) (accepting *Mimms* standard describing being told to stand outside a car as opposed to sitting in the car as "a permissible de minimis intrusion"), and several appeals panels, before and since, have done so. *People* v. *Martinez*, 187 Mich. App. 160, 165-166 (1991) (extending *Mimms* to passengers pre-*Wilson*); *People* v. *Laube*, 154 Mich. App. 400, 408-410 (1986); *People* v. *Blackburne*, 150 Mich. App. 156, 164-165 (1986). Further, on reconsideration, the panel in *Hamelin, supra* at 531, held that the evidence in that case was wrongly suppressed because the search and seizure provision in the Michigan State Constitution provides that it "shall not be construed to bar from evidence in any criminal proceeding, any narcotic drug, firearm, bomb, explosive or any other dangerous weapon, seized by a peace officer outside the curtilage of any dwelling house in this state." Art. 1, § 11, of the Michigan Constitution. As the evidence Gonsalves seeks to have suppressed in this case is cocaine and it was seized outside the home, even this outlier of a case cited by the court would support a result different from that reached by the majority today.

extend *Mimms* to passengers, only three have declined, and, of these three, two were decided prior to *Wilson*, seriously undermining any claim as to their continuing validity. See Appendix. Indeed, it is significant that the one State court decision to which the court does point and from which it quotes at length, *State* v. *Smith*, 134 N.J. 599 (1994), explicitly endorsed *Mimms*, but declined to extend it to passengers. *Id.* at 617-619. Moreover, that case was decided before *Wilson*. And since *Wilson* two New Jersey courts have questioned the continuing validity of *Smith*. See *State* v. *Arthur*, 149 N.J. 1, 16 (1997) (discussing both *Mimms* and *Wilson* and noting that *Smith* was "prior to *Wilson*"); *In re A.P.*, 315 N.J. Super. 166, 169-171 (1998) (discussing with approval both *Mimms* and *Wilson* and distinguishing permissibility of exit order while performing community caretaking function from *Mimms-Wilson* rule applicable to lawful traffic stops).

The Supreme Court's decision in *Mimms*[4] explained in some detail why ordering a lawfully stopped motorist to leave his vehicle might be a reasonable safety precaution. Measured against the danger to the officer, the Court judged that the inconvenience to the motorist was minimal. As I have said, the court today makes only the most passing reference to these compelling facts. But *Mimms* and *Wilson* represent a more general judgment than that regarding the relative weight of the interests of the police and the stopped motorist. The Supreme Court is deliberately promulgating a simple bright-line rule, which police officers and judges can readily understand and administer. This is in response to a widespread sentiment that Fourth Amendment law had become far too complex, replete with many factored tests and complex balancing of factors.[5] Such complexity is particularly inappropriate in an area of law

---

[4]The court today characterizes *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), as the abandonment of some prior rule akin to that which it today proclaims and to which it suggests the Supreme Court used to adhere until somehow it went astray. But *Mimms* overruled no precedent. The court, therefore, does not here hold fast to some great tradition, while the Supreme Court loses its way.

[5]See Sklansky, Traffic Stops, Minority Motorists, and the Future of the Fourth Amendment, 1997 Sup. Ct. Rev. 271, 291-298, citing sources including Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 758, 761 (1994); Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 417 (1974); Dworkin, Fact Style Adjudication and the Fourth Amendment: The Limits of Lawyering, 48 Ind. L.J. 329 (1973); Wasserstrom, The Fourth Amendment as Constitutional Theory, 77 Geo. L.J. 19, 20 (1988).

which is to be administered by police officers in the field, often
in dangerous and confused circumstances. *Mimms* and *Wilson*
are but two examples of the Supreme Court's attempt to make
the law of searches and seizures more appropriate to the
circumstances to which it applies.[6] The virtue of *Mimms* and
*Wilson* is that they do not require the officers to weigh up the
factors and circumstances before taking one simple step to
increase their own safety. *Mimms* and *Wilson* would also take
judges out of the business of making similar fine-grained inquir-
ies after the fact in order to determine whether the police's self-
protective measures were justified. Rather, there is substituted a
global judgment and a simple, bright-line rule. The recent deci-
sion of the Supreme Court in *Knowles* v. *Iowa*, 119 S. Ct. 484
(1998), to which the court adverts, is entirely consistent with
this development. *Mimms* and *Wilson* establish what may be
done in a proper traffic stop, and *Knowles* makes clear that
when the reason for the stop has been exhausted, so is the basis
for the self-protective and other measures. And that is all that
our many cases — *Commonwealth* v. *Torres*, 424 Mass. 153
(1997); *Commonwealth* v. *Loughlin*, 385 Mass. 60 (1982); *Com-
monwealth* v. *Ferrara*, 376 Mass. 502 (1978) — which the
court today cites for its decision hold, as the court's own paren-
theticals show.[7] The Supreme Court's pursuit of bright-line
rules that would avoid what the Court called a "bog of litiga-
tion" was again illustrated in the very recent case of *Wyoming*

---

[6]This, in my view, is the best explanation of our unwillingness in *Com-
monwealth* v. *Macias*, *post* 698, 701 (1999), to follow the Supreme Court in
lowering the standard for a no knock warrant to reasonable suspicion. In that
case a judicial officer makes the decision to dispense with the knock and an-
nounce requirement at the same hearing at which he determines whether a
warrant should issue at all. There is, in the context of that process, none of the
need for a split-second intuitive judgment to engage in a protective measure
as there is here and in a *Terry* stop.

[7]The majority opinion cites numerous cases from this court and the Appeals
Court as examples of protections guaranteed by art. 14 that "may not be
recognized under the Fourth Amendment." *Ante* at 662. In fact, each and
every one of the examples given is entirely consistent with Fourth Amend-
ment requirements. These cases simply stand for the proposition that, in order
to extend a stop beyond the time necessary to complete the purpose for which
the stop was made, the police must have probable cause. This is required by
the Fourth Amendment. See *Knowles, supra*. The *Mimms-Wilson* doctrine
does not authorize extended detention or any search without probable cause. It
simply allows the officer, for his own safety, to have the occupants of a
vehicle wait outside the vehicle, where their actions can be observed, rather

v. *Houghton*, 119 S. Ct. 1297, 1303 (1999), where the Court refused to condemn the search of the handbag of a passenger in an automobile the police reasonably believed contained contraband, without any particularized belief relative to that handbag or that passenger. See *id.* at 1304 (Breyer, J., concurring).

Of course there is a balancing of competing interests in these decisions, but what the court misses today is what might be called the second-order balancing that weighs the advantages of a myriad of complex individual determinations against the clarity of a readily understood and readily administered bright-line rule.

### III

Now what does the court offer as a basis for rejecting the balance struck in a long line of Supreme Court decisions,[8] and by virtually all of our sister States? See Appendix. Certainly not our precedents, because we have consistently cited *Mimms* with approval, although sometimes tacking on language which misreads what is the salient and evident holding of that case. In the light of these many citations, the opening flourish in the court's analysis of our cases, "We have not adopted *Mimms*," is somewhat surprising. *Ante* at 661. Moreover, we have never once until this day invoked art. 14 in respect to exit orders, and therefore whether we have misread *Mimms* or not,[9] we were certainly bound by it in applying the Fourth Amendment.

No, this is pure policy. And what is the basis for this policy? That the intrusions on operators and passengers are not so minimal as the Supreme Court and almost every other State

than inside the vehicle, where they cannot.

It should only be added that when our cases speak of the production of a "valid" license and registration as terminating the officer's grounds for further detaining a motorist, this must include the time it takes to check by radio or computer whether the documents produced are indeed valid.

[8] See Sklansky, *supra* at 282-291.

[9] The court relies on "the principles expressed in the *Santana* decision." *Ante* at 662. But *Commonwealth v. Santana*, 420 Mass. 205, 212-213 (1995), purports to follow *Mimms* and, as all of our cases on this subject until this one, does not mention art. 14 (a provision we certainly know how to deploy when we want to, see *Commonwealth v. Upton*, 394 Mass. 363 [1985]). Our decision in *Commonwealth v. Torres*, 424 Mass. 153 (1997), which is the sole reference to art. 14 cited by the majority, invokes art. 14 not in this context but in respect to the continued detention of the subject of a routine traffic stop after the purpose of the stop had been effectuated. Our decision there is entirely consistent with the Supreme Court's decision in *Knowles v. Iowa*, 119 S. Ct. 484 (1998).

court think,[10] and that the police officers may after all get all the protection they need, because "it does not take much for a police officer to establish a reasonable basis to justify an exit order." *Ante* at 664. But that is just the point: it does not take much because the danger is ever present and therefore both police officers and the administration of justice are better served by the Supreme Court's bright-line rule. In this respect, the bright-line *Mimms-Wilson* rule is analogous to the patfrisk that may accompany a lawful *Terry* stop. See *Terry* v. *Ohio*, 392 U.S. 1, 24-25 (1968). As in the traffic stop, the initial intrusion does require some demonstrable predicate, but neither the Supreme Court nor this court has ever demanded that an officer conducting a patfrisk must — to use the court's phrasing today — "establish a reasonable basis" for the protective measure. If the stop is lawful, this further minor intrusion is entirely within the officer's discretion. See *Terry*, *supra* at 30; *Commonwealth v. Fraser*, 410 Mass. 541, 544-545 n.4 (1991), quoting 3 W.R. LaFave, Search and Seizure § 9.4(a), at 499 (2d ed. 1987 & Supp. 1991) ("A protective frisk of a suspect under the principles of *Terry* may be warranted where there is 'some legitimate basis for the officer being in immediate proximity to the person' "). The reason is the same here: to ask more is to put the officer in danger for insufficient reason.

Unfortunately the court chooses to bolster its policy judgment by invoking the inflammatory issue of race: "Routine traffic stops may also pose unique hardships on minorities who, it has been argued, are often the subject of stops on pretext." *Ante* at 663. What work is the word "pretext" doing here? Is the traffic stop justified, or is it not? If it is not, then of course it constitutes an unlawful seizure and resulting searches are also unlawful. What the court must mean is that the traffic stop is lawful, but the discretion to make the stop is invoked discriminatorily against minorities, as the materials cited by the court and the concurrence clearly indicate. And that discriminatory imposition may then be the occasion for imposing, in a discriminatory way,

---

[10]In arguing that the intrusion is not minimal, the majority states that the driver, and especially any passengers, have an interest in having the stop concluded quickly. The *Mimms-Wilson* rule is mindful of this concern. The Fourth Amendment does require that the stop not be extended in duration without probable cause. The *Mimms-Wilson* rule does not allow officers to extend the duration of a lawful stop but only to determine where the occupants wait for the time necessary to effectuate the purpose for which the stop was made.

the further humiliation that the court discerns in police exit orders. Although I completely agree that the discriminatory enforcement of the law is a shame and a disgrace, as Professor Randall Kennedy has so eloquently argued, see Kennedy, Race, Crime, and the Law c. 4 (1997), I think it is fanciful to imagine that by weaving a gossamer garment of complicated rules, we will do anything at all to root out this behavior wherever it exists. Does not the court seek to justify this very decision by arguing that "it does not take much for a police officer to establish a reasonable basis to justify an exit order?" Surely bigoted or abusive police officers, bent on mischief, will have no difficulty at all in concocting such a "reasonable basis" after the fact. It is a fundamental error to fashion rules that will hamper only conscientious officers in order to restrain the unconscientious and abusive, who in any event will evade them. The conscientious officer who follows the court's ruling today must hesitate in order to ponder whether he has that "objective" and "articulable" basis for ordering a driver or his passenger out of a lawfully stopped vehicle. That moment's hesitation may cost him his life. That is what the Supreme Court concluded a long time ago and that is the judgment to which it has adhered ever since. The unscrupulous officer will do as he pleases and find his justification afterward.

So it comes down to two policy judgments: that of the Supreme Court and of almost all other State courts, or the one this court promulgates today in the name of our State Constitution. I prefer the Supreme Court's judgment and the judgment of State courts across the nation. May not the majority of this court prefer its own? Is there no principle of choice, no metric of judgment here? This is an utterly false dilemma, and the maxim, in dubiis libertas, cuts sharply against what the court does today. For the Supreme Court's rule leaves the Legislatures of this nation — which, after all, have the mandate, the experience, and the means to make policy judgments — free to enact more stringent measures if they deem it appropriate. This court's action today removes that option from the Legislature. Our Legislature has, on several occasions, enacted procedural protections against police practices more stringent than we were prepared to impose in the name of the Constitution. Even now, as the court's and the concurring opinion's citations indicate, the problem of discriminatory enforcement of traffic laws has caught the attention of our and other State Legislatures and State and Federal executive policy makers. Quite apart from the

greater legitimacy of policy making by the Legislature, the Legislature has the means to gather the facts, to develop structured remedial systems, and the ability to reverse course if it makes a mistake. When we speak in the name of the Constitution, however, we purport to speak for the ages and, absent a change of heart, only a constitutional amendment can reverse a mistaken course of decision. But the technical and particularistic nature of today's mistaken decision does not allow even that cumbersome remedy, and the people of the Commonwealth must rely entirely on this court's wisdom and restraint. Cf. *District Attorney for the Suffolk Dist.* v. *Watson*, 381 Mass. 648 (1980) (death penalty violates State Constitution), overturned by the 1982 amendment (art. 116 of the Amendments) to art. 26 of the Massachusetts Declaration of Rights.

## IV

Finally, I must respond to the court's invocation of history to justify, maybe even to compel, its unwise and idiosyncratic decision. This is the argument that John Adams made me do it. Of course we have a duty to come to our own conclusion about the meaning of our own Constitution, and no one asserts otherwise. This is particularly so if the wording of our Declaration of Rights is more stringent than that of the Bill of Rights. See, e.g., *Commonwealth* v. *Amirault*, 424 Mass. 618, 628-631 (1997); *Commonwealth* v. *Hinckley*, 422 Mass. 261 (1996). In this case the two formulations are, in all relevant respects, identical. Of course even then "we can go up," and place greater restrictions on law enforcement than the Supreme Court has decreed. This is a truism. We are not free to go down, so "up" is the only direction in which we may move, but that proves nothing. The directional metaphor of "up" suggests that more is necessarily better, as are more parks, more teachers, more safety, and more security. But that begs the central question. Are more and more restrictions on law enforcement, more and more elaborate rules better; is that trend really "up?" Thus, rather than engaging in judicial chauvinism we should ask: Is this decision wise, and — far more to the point — is there something in our Constitution that authorizes us to announce this anomalous rule and, by styling it a constitutional judgment, to put it beyond the reach of the ordinary processes of government? There is not.

As for history, research shows that many of the complexities we have thrown up about the process of investigating, prosecut-

ing and punishing crime were far from the contemplation of those who framed either the Bill of Rights or our own Declaration of Rights. See Amar, The Fourth Amendment, Boston, and the Writs of Assistance, 30 Suffolk U. L. Rev. 53 (1996); Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757 (1994); Langbein, The Historical Origins of the Privilege Against Self-Incrimination at Common Law, 92 Mich. L. Rev. 1047 (1994). These and other restrictions are of more recent vintage, based in large part on a series of warmly contested decisions of the United States Supreme Court primarily during the decade of the 1960's. See, e.g., *Furman* v. *Georgia*, 408 U.S. 238, 257 (1972) (Brennan, J., concurring) (death penalty violates Eighth Amendment to the United States Constitution); *Miranda* v. *Arizona*, 384 U.S. 436 (1966); *Griffin* v. *California*, 380 U.S. 609 (1965); *Mapp* v. *Ohio*, 367 U.S. 643 (1961). And as for the integrity of our distinct constitutional traditions, the striking thing is that, often as not, these Supreme Court decisions compelled us to abandon long-standing lines of decision interpreting our Declaration of Rights. See, e.g., *Commonwealth* v. *Tibbetts*, 157 Mass. 519 (1893); *Commonwealth* v. *Dana*, 2 Met. 329 (1841). Cf. Cassell, The Mysterious Creation of Search and Seizure Exclusionary Rules under State Constitutions: The Utah Experience, 1993 Utah L. Rev. 751. That is why the invocation of our own independent traditions on this, as on other occasions, e.g., *Commonwealth* v. *Stoute*, 422 Mass. 782, 786-787 (1996) (declining to follow *California* v. *Hodari D.*, 499 U.S. 621 [1991]); *Commonwealth* v. *Lyons*, 409 Mass. 16, 18 (1990), and *Commonwealth* v. *Upton*, 394 Mass. 363, 371 (1985) (declining to follow *Illinois* v. *Gates*, 462 U.S. 213 [1983] [totality of the circumstances in determining reasonable suspicion and probable cause]); *District Attorney for the Suffolk Dist.* v. *Watson*, *supra* at 666-667 (declining to follow *Gregg* v. *Georgia*, 428 U.S. 153 [1976]), is more than a little opportunistic. What in fact has happened is that after the brief burst of activity in the Supreme Court, the Court itself calmed down and declined, in a series of decisions of which *Mimms* and *Wilson* are but two, to extend the doctrines of that brief earlier period. That more sober trend, of course, invoked the strong disapproval of the dwindling number of Justices who in dissent would have extrapolated from the sometimes salutary positions marked out in the earlier decade. And sensing defeat, the call went out for State courts to take up the work in the

name of their own State Constitutions. Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977). That, and not John Adams, is the historical foundation of today's unfortunate decision.

For these reasons, I respectfully dissent.

APPENDIX.

A Survey of the Permissibility of Automatic Exit Orders to Lawfully Stopped Drivers and Passengers

I.     Automatic Exit Orders Permissible as to Both Drivers and Passengers (twenty-five States and the District of Columbia).

The following jurisdictions either applied the holding of *Pennsylvania* v. *Mimms*, 434 U.S. 106 (1977), allowing law enforcement officials to issue ,automatic exit orders to drivers, to passengers prior to *Maryland* v. *Wilson*, 519 U.S. 408 (1997), or have since applied or expressed agreement with *Wilson*.

Alaska:          State *vs.* Wystrach, No. A-6158, slip op. at 1 (Alaska Ct. App. May 28, 1997) (overturning suppression of evidence found on passenger in vehicle stating "[t]he record in [this] case is not clear whether [the defendant] was 'asked' or 'directed' to roll down her window. . . . However, even assuming that [the defendant] was ordered to roll down her window, it appears that this directive was a lesser intrusion than is authorized under *Wilson*").

Arizona:         *State* v. *Webster*, 170 Ariz. 372, 373-374 (Ct. App. 1992) (holding that *Mimms* rule applies equally to both drivers and passengers and even encompasses further order to get back into car).

Arkansas:        *Wright* v. *State*, 327 Ark. 558, 562 (1997) (applying *Mimms-Wilson* rule to driver and passenger).

California:      *People* v. *Wilson*, 59 Cal. App. 4th 1053, 1061 (1997) (citing *Mimms* and *Wilson* as evidence that "the United States Supreme Court has made it clear the Fourth Amendment exclusionary rule is not to be interpreted so as to endanger police officers in the responsible performance of their duties"). *People* v. *Castaneda*, 35 Cal. App. 4th 1222, 1230 (1995) (quoting *Mimms* for the proposition that requesting a driver to step out of a car "after the driver [i]s lawfully detained" is a reasonable and minimal intrusion).

Connecticut:     *State* v. *Wilkins*, 240 Conn. 489, 494 n.9 (1997) ("following a valid traffic stop, an officer may request the driver to step out of his or her vehicle. . . . Indeed, the Supreme Court has recently held that this authority extends to passengers as well").

| | |
|---|---|
| District of Columbia: | *Thomas* v. *United States*, 553 A.2d 1206, 1208 n.7 (D.C. 1989) (taking note of *Mimms* and the fact that choice of safety over "minimal intrusion" had been extended to passengers pre-*Wilson*). |
| Florida: | *Bratcher* v. *State*, 727 So. 2d 1114 (Fla. Dist. Ct. App. 1999) ("Once the deputy undertook the investigatory stop, he could briefly detain the men and request that they identify themselves. The driver and passenger could be ordered to exit the vehicle in connection with this brief investigation"). *J.B.* v. *State*, 718 So. 2d 1280, 1281 (Fla. Dist. Ct. App. 1998) ("Because of the dangers which police officers encounter in stopping vehicles, they, as a matter of routine, may order a passenger to get out of a lawfully stopped vehicle without reasonable suspicion"). *Borski* v. *State*, 712 So. 2d 787, 788 (Fla. Dist. Ct. App. 1998) (approving of *Mimms-Wilson* rule and holding the rule extends to orders to driver or passenger to remain in the vehicle). |
| Georgia: | *Thomas* v. *State*, 231 Ga. App. 173, 174 (1998) (citing *Mimms* in ratifying exit order directed at driver). *Holt* v. *State*, 227 Ga. App. 46, 50 (1997) (citing *Wilson* with approval). |
| Illinois: | *People* v. *Gonzalez*, 294 Ill. App. 3d 205, 212, aff'd, 184 Ill. 2d 402 (1998), petition for cert. filed (U.S. Feb. 26, 1999) (No. 98-8359) (applying the *Mimms-Wilson* rule and further holding that it is permissible for officer to require that passenger remain at the scene, stating "we do not believe that requiring [the passenger] to remain at the scene causes a significant additional deprivation of personal liberty"). |
| Indiana: | *Warr* v. *State*, 580 N.E.2d 265, 267 (Ind. Ct. App. 1991) (extending *Mimms* holding to passengers pre-*Wilson*). *Young* v. *State*, 564 N.E.2d 968, 970 (Ind. Ct. App. 1991) (following *Mimms* and stating that the officer's brief detention of a driver outside of his car was a "de minimis intrusion . . . even where nothing specific indicate[d] that the officer's personal security may be in jeopardy"). |
| Iowa: | *State* v. *Doran*, 563 N.W.2d 620, 623 (Iowa 1997) (authorizing, under State Constitution, automatic searches incident to traffic citations). But see *State* v. *Becker*, 458 N.W.2d 604, 607 (Iowa 1990) (considering, pre-*Wilson*, whether *Mimms* rationale extends to passengers and determining that articulable grounds for suspicion are necessary before an officer can order a passenger from a vehicle). Note that the *Becker* court cites authority from three other States — Louisiana, Tennessee, and Pennsylvania — to support its conclusion. The Louisiana case cited was explicitly overruled by *State* v. *Landry*, 588 So. 2d 345 (La. 1991). The Pennsylvania case has also been overruled. The Tennessee case has not been reconsidered or applied in the nearly twenty years since it was decided. |

The decision to allow the greater intrusion of a search incident to a traffic citation and the subsequent decision in *Wilson* makes refusal to extend *Mimms* to passengers highly unlikely.

Louisiana:    *State* v. *Drake*, 733 So. 2d 33 (1999) (confirming that State law is consistent with *Wilson* decision, stating "[w]hen a vehicle is stopped — even for a traffic violation — officers may lawfully order its passengers to exit the vehicle"). *State* v. *Landry*, 588 So. 2d 345, 347 (La. 1991) (accepting *Mimms* and extending its holding to passengers pre-*Wilson* because ensuring officers' safety was sufficient to justify what court characterized as a "slight inconvenience" to individuals involved).

Maryland:     *Graham* v. *State*, 119 Md. App. 444, 447 (1998) (explaining state of the law under *Mimms* and *Wilson*).

Minnesota:    *State* v. *Ferrise*, 269 N.W.2d 888, 890 (Minn. 1978) (extending *Mimms* rule to passengers pre-*Wilson* and holding that, as officers may order occupants out of the car, they may also open occupants' doors for purposes of ordering them out of the vehicle). State *vs.* Perkins, No. C5-97-2013 (Minn. Ct. App. May 5, 1998) (same, post-*Wilson*).

Missouri:     *State* v. *Reynolds*, 753 S.W.2d 1, 2 (Mo. Ct. App. 1988) (stating, pre-*Wilson*, that "[o]nce a vehicle is lawfully detained for a traffic violation, a police officer may order the occupants to get out of the vehicle. . . . The officer need not suspect foul play from the vehicle's occupants at the time of the stop," citing *Mimms*, *supra* at 109).

Montana:      *State* v. *Roberts*, 284 Mont. 54 (1997) (citing *Wilson*, holding that an officer, who stopped automobile because he believed arrest warrant existed for driver, did not unlawfully detain passenger by directing him to remain in the vehicle). *State* v. *Stubbs*, 270 Mont. 364, 369 (1995) (reversing lower court's ruling that search exceeded the constitutionally permissible, quoting *Mimms* for the proposition that "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers").

New York:     *People* v. *Robinson*, 74 N.Y.2d 773, 775, cert. denied, 493 U.S. 966 (1989) (citing *Mimms* and further holding, pre-*Wilson*, that "precautionary police conduct directed at a passenger in a lawfully stopped vehicle is equally authorized, within Federal constitutional guideposts, as that applied to a driver. Inasmuch as the risks in these police/civilian vehicle encounters are the same whether the occupant is a driver or a passenger, 'police may order persons out of an automobile during a stop for a traffic violation' "). *People* v. *Harris*, 173 Misc. 2d 49, 52 & n.2 (N.Y. Sup. Ct. 1997) (explaining that "[t]he U.S. Supreme Court in [*Mimms*] announced the rule that the driver of a

motor vehicle who has been lawfully stopped for a traffic offense could be ordered out of that vehicle by the police officer; the Court of Appeals followed the pronouncement. . . . The Court of Appeals in [*Robinson*] thereafter decided that the same rule applied to the passengers in the stopped vehicle" and "[t]he U.S. Supreme Court decided likewise in [*Wilson*]").

Ohio:                  *State* v. *Robinette*, 80 Ohio St. 3d 234, 239 (1997) (citing *Mimms* and holding automatic exit order "justified because it was a traffic stop"). *State* v. *Evans*, 67 Ohio St. 3d 405, 408 (1993), cert. denied, 510 U.S. 1166 (1994) ("Unlike an investigatory stop, where the police officer involved 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion,' . . . a *Mimms* order does not have to be justified by any constitutional quantum of suspicion"). State *vs.* Ross, No. 16135 (Ohio Ct. App. Aug. 29, 1997) ("pursuant to *Maryland* v. *Wilson*, [the officer] possessed the authority to order [the defendant, a passenger] out of the car pending the issuance of her ticket").

Pennsylvania:          *Commonwealth* v. *Rodriguez*, 695 A.2d 864, 868-869 (Pa. Super. Ct. 1997) ("This court has recently determined that the effect of *Mimms* is to require that 'police may request both drivers and their passengers to alight from a lawfully stopped car without reasonable suspicion that criminal activity is afoot,' " quoting *Commonwealth* v. *Brown*, 439 Pa. Super. 516, 528 (1995), and noting that the Supreme Court later did the same in *Wilson*).

Rhode Island:          *State* v. *Milette*, 727 A.2d 1236 (R.I. 1999) (noting that "[t]his Court has long recognized that a police officer may order the driver of a lawfully stopped motor vehicle to exit the vehicle for the purposes of verifying identification and to further the strong public interest in securing the safety of law enforcement officers," citing *State* v. *Aubin*, 622 A.2d 444, 445 [R.I. 1993], *Wilson*, and *Mimms*). *State* v. *Lombardi*, 727 A.2d 670 (R.I. 1999) (noting *Wilson* decision extending *Mimms* to passengers and that "[i]n *State* v. *Soares*, 648 A.2d 804 [R.I. 1994], we had some four years earlier held that a police officer had a clear right to order a passenger in a car that had been validly stopped for any reason to step out of the car").

South Dakota:          *State* v. *Ashbrook*, 586 N.W.2d 503, 508-509 (S.D. 1998) ("[T]he passenger would have had to wait until [the officer] had completed his transactions with [the driver] in any event. . . . The only change in the passenger's condition during the stop was that she had to wait outside, rather than inside, the van," citing *Wilson* and noting "the danger to officers is greater when there are passengers in a stopped car"). *State* v. *Tilton*, 561 N.W.2d 660, 664 (S.D. 1997) ("an officer making a traffic stop may order passengers to get out of the car pending completion of the stop").

Texas:   *Josey* v. *State*, 981 S.W.2d 831, 840 (Tex. Ct. App. 1998) (citing *Mimms* and *Wilson* and stating "[b]ecause an officer's safety may be threatened by a passenger's access to weapons in an automobile, an officer may, as a matter of course, order a passenger in a lawfully stopped vehicle to exit the vehicle pending completion of the stop."). *Rhodes* v. *State*, 945 S.W.2d 115, 118 (Tex. Crim. App.), cert. denied, 522 U.S. 894 (1997) (safety precautions as to passenger upheld pursuant to *Mimms-Wilson* rule). *Goodwin* v. *State*, 799 S.W.2d 719, 727 (Tex. Crim. App. 1990) (citing *Mimms*, stating "[p]olice officers are allowed to order drivers out of their cars once they have been lawfully stopped for a traffic offense").

Utah:   *State* v. *Shepard*, 955 P.2d 352, 356 (Utah Ct. App. 1998) (noting that the Utah Supreme Court had, pre-*Wilson*, "noted that under *Mimms*, a police officer may order a driver — but not a passenger — out of a car during a traffic stop," then holding, since *Wilson* had been decided, "until the Utah Supreme Court decides otherwise under the Utah Constitution, *Wilson* is controlling in Utah").

Virginia:   *Harris* v. *Commonwealth*, 27 Va. App. 554, 562 (1998) (the court noted that "[f]ollowing a lawful traffic stop, the Fourth Amendment permits the police to order the passengers to get out of the car pending the completion of the stop," and that "this Court has previously held that police officers may also detain passengers beside an automobile until the completion of a lawful traffic stop"). Note that, pre-*Wilson*, the Virginia Supreme Court declined specifically to reach the issue whether *Mimms* extended to passengers, stating, in *Bethea* v. *Commonwealth*, 245 Va. 416, 419 (1993), "we note that the Supreme Court specifically limited its holding in *Mimms* to circumstances in which a police officer orders the driver to get out of a vehicle after the vehicle has been lawfully stopped," and holding it "need not determine whether the de minimis rationale utilized in *Mimms* is applicable to a passenger in a vehicle when the initial vehicle stop is predicated solely on matters pertaining to the driver. The facts of this case only require the application of the more general principle that Fourth Amendment interests are not violated when a police officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'"

Wisconsin:   *State* v. *Kehler*, 211 Wis. 2d 889 (Ct. App. 1997) ("Once a police officer has lawfully detained an automobile for a traffic violation, 'the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures,'" citing *Mimms* and *Wilson*. Further, the court held that, "officers' subjective motivations for the stop are irrelevant," as long as the stop was lawful).

Wyoming:   *Houghton* v. *State*, 956 P.2d 363, 372 (Wyo. 1998)

(Golden, J., dissenting), rev'd, 119 S. Ct. 1297 (1999) (dissent explains that under *Mimms-Wilson* rule, automatic exit orders may be directed at both drivers and passengers, majority appears to agree on this point but holds evidence belonging to passenger, found during subsequent search of vehicle, to be inadmissible. *Id.* at 370. Supreme Court overrules, finding that evidence should not have been suppressed).

II.    Automatic Exit Orders Permissible to Drivers.

A.    Silent as to Passengers (sixteen States).

The following jurisdictions have accepted *Mimms* but have not had cause to address the issue as it pertains to passengers. As these jurisdictions have accepted *Mimms,* there is no reason to believe that *Wilson* is not similarly the law of the State.

Alabama:             *Ex parte Carpenter,* 592 So. 2d 627, 631 (Ala. 1991) (where driver and passenger ordered out of the vehicle, court, citing *Mimms,* stated "[o]nce a police officer with reasonable suspicion has stopped a suspect in an automobile, the officer has the authority to ask the suspect to get out of the automobile. . . . This intrusion is de minimis when balanced with concerns for the officer's safety").

Colorado:            *People* v. *Carlson,* 677 P.2d 310, 314 (Colo. 1984) (extending *Mimms* rationale to investigatory stop on reasonable suspicion of traffic violation, in contrast to stop for purpose of issuing citation for known traffic violation as in *Mimms*)

Delaware:            Hall *vs.* State, No. C.A. 97M-03-001 (Del. Super. Ct. May 11, 1998) (ratifying automatic exit order to driver).

Idaho:               *Sprague* v. *Burley,* 109 Idaho 656, 664 (1985) (ratifying stop quoting *Mimms, supra* at 110-111, and holding "a driver stopped for ticketing may be ordered out of his car without the officer showing any particular grounds for believing he was in danger, as 'this additional intrusion can only be described as de minimis.' . . . Hence, without any showing that the particular suspect may be armed, an officer may require a person lawfully stopped to alight from his or her car in order to diminish 'the possibility, otherwise substantial, that the driver can make unobserved movements' ").

Kansas:              *State* v. *Burks,* 15 Kan. App. 2d 87, 90 (1990) (stating that the court had applied *Mimms* and "also relied on *Mimms* to find that removing an occupant from a car did not violate the Fourth Amendment" but finding that officers were not justified in ordering passenger from car and pat-frisking him without articulable suspicion).

Kentucky:            *Docksteader* v. *Commonwealth,* 802 S.W.2d 149, 150 (Ky. Ct. App. 1991) (citing *Mimms* approvingly).

Commonwealth *v.* Gonsalves.

| | |
|---|---|
| Maine: | *State* v. *Izzo*, 623 A.2d 1277, 1281 (Me. 1993) (upholding exit order and citing *Mimms*). |
| Michigan: | People v. *Bloyd*, 416 Mich. 538, 552 (1982) (accepting *Mimms* standard describing being told to stand outside a car as opposed to sitting in the car as "a permissible de minimis intrusion"). |
| Nebraska: | *State* v. *Crom*, 222 Neb. 273, 283 (1986) (Krivosha, C.J., concurring) (quoting *Mimms* for the proposition that the reasonableness of seizures less intrusive than traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers"). |
| New Hampshire: | *State* v. *Hamel*, 123 N.H. 670, 676 (1983) (citing *Mimms* for the proposition that a police officer's order to get out of car is a de minimis intrusion). |
| New Mexico: | *State* v. *Lovato,* 112 N.M. 517, 522 (Ct. App. 1991) (upholding exit order, stating "[e]ven in routine traffic stops, police may adopt precautionary measures addressed to reasonable fears. . . . In *Mimms* the Supreme Court recognized the inordinate risks police take when they approach cars with persons seated in them, and approved the practice of requiring the persons to get out of the car and be subject to a protective frisk even in the absence of individualized suspicion"). |
| North Carolina: | *State* v. *Hamilton*, 125 N.C. App. 396, 400 (1997) (quoting *Mimms*, stating, "[t]his Court has recently held that the Fourth Amendment is not violated when an officer requires a driver of a vehicle, stopped for a traffic violation, to exit the vehicle. . . . This procedure reduces the likelihood of assault on the officer and 'is not a "serious intrusion upon the sanctity of the person" ' " and upholding exit order to passenger as well although noting that the passenger had also committed a violation by not wearing his seat belt). |
| North Dakota: | *State* v. *Mertz*, 362 N.W.2d 410, 413 (N.D. 1985) (holding that "the Supreme Court's reasoning in *Mimms* should be extended to the facts of this case so as to justify [the officer's] action in ordering [the defendant] into the patrol car during issuance of the speeding citation"). |
| Oklahoma: | *Loman* v. *State*, 806 P.2d 663, 666 (Okla. Crim. App. 1991) (citing *Mimms*). |
| South Carolina: | *State* v. *Smith*, 329 S.C. 550, 556 (Ct. App. 1998) (officer who observed defendant speeding was justified in stopping him and subsequently asking him to step out of his vehicle, citing *Mimms*). |
| West Virginia: | *State* v. *Boswell*, 170 W. Va. 433, 439-441 (1982) (citing |

*Mimms* but finding that defendant was not even seized, as officer merely asked for identification and defendant alighted from vehicle on his own volition).

B.    Automatic Orders to Passengers Not Permitted (decisions preceding *Wilson*) (two States).

The following jurisdictions accepted *Mimms* but, prior to *Wilson,* declined to implement a bright-line rule allowing exit orders as to passengers.

New Jersey:      *State* v. *Arthur,* 149 N.J. 1, 16 (1997) (discussing both *Mimms* and *Wilson* and noting that *State* v. *Smith,* 134 N.J. 559 [1994], was "prior to *Wilson*"): *State* v. *Smith,* 134 N.J. 559, 610-611, 612 (1994) (explicitly adopted the holding of *Mimms*: "we conclude that the *Mimms* test, as applied to drivers, satisfies the New Jersey Constitution as well," but holding, pre-*Wilson,* that *Mimms* did not extend to passengers). *In re A.P.,* 315 N.J. Super. 166, 169-171 (1998) (discussing with approval both *Mimms* and *Wilson* and distinguishing permissibility of exit order while performing community caretaking function from *Mimms-Wilson* rule applicable to lawful traffic stops).

Tennessee:      *Johnson* v. *State,* 601 S.W.2d 326, 327 (Tenn. Crim. App. 1980) (accepting *Mimms* the court, pre-*Wilson,* stated "[t]he narrow question we face is whether a police officer, after having stopped a motor vehicle for a traffic violation, has the right to 'check the passengers' who happen to be in the vehicle, nothing else appearing amiss. We hold that officers have no such right").

C.    Automatic Orders to Passengers Not Permitted (decisions rejecting *Wilson*) (one State).

The following jurisdiction has accepted *Mimms* but has decided that passengers in a vehicle have additional rights under the State Constitution which prevent their being asked to exit a vehicle without particularized suspicion.

Washington:      *State* v. *Mendez,* 137 Wash. 2d 208, 220 (1999) (holding *Mimms* rule regarding drivers consistent with Washington Constitution but refusing to extend the bright-line rule to passengers as in *Wilson*).

III:    Automatic Exit Orders Not Permitted as to Either Drivers or Passengers (two States).

The following jurisdictions have, in one case explicitly and the other implicitly, rejected the Supreme Court's balancing of the interests and have not allowed law enforcement officers to issue automatic exit orders.

Hawaii:      *State* v. *Kim,* 68 Haw. 286, 287-288 (1985) (order to exit car requires a reasonable basis of specific articulable facts to believe a crime has been committed under Hawaii Constitution).

Oregon:                    *State* v. *Morton*, 151 Or. App. 734, 739 (1997) (exit order
to passenger deemed unconstitutional where officer testi-
fied that order was to investigate possibility of drug crime,
not due to safety concerns). *State* v. *Peterson*, 143 Or.
App. 505 (1996) (exit order *to* driver unreasonable where
"there was nothing in defendant's behavior to suggest im-
minent aggressiveness or hostility toward [the officer]").
Note: neither case makes any reference whatsoever to
either *Mimms* or *Wilson* and there is some hint that the
rejection of this line of cases is compelled by a State
statute. See *State* v. *Lanig*, 154 Or. App. 665, 667 (1998)
(citing Or. Rev. Stat. § 810.401[3][b] [1997], which has
been construed *to limit the course* of police action during
a stop for a traffic infraction).

IV:    No Authority or Undecided (three States).

The following jurisdictions either have not clearly ruled on the issue of
the permissibility of automatic exit orders or have not dealt with the issue at
all in a published opinion.

Mississippi:               No authority found.

Nevada:                    No authority found.

Vermont:                   *State* v. *Caron*, 155 Vt. 492, 501 (1990) (holding that
"[w]here a police officer has made an initial stop based on
a reasonable suspicion that the occupants have participated
in a violent felony and there is a high likelihood that the
occupants might be dangerous, we see no reason to
preclude the officer from taking the protective measure of
asking the occupants to step from the vehicle"). *State* v.
*Jewett*, 148 Vt. 324, 329-330 (1987) (court asked to reject
*Mimms* and hold that Vermont constitution requires officer
to have reasonable suspicion that occupant is armed and
dangerous before officer can order occupant from vehicle;
the court, however, did not reach this question finding that
there was reasonable suspicion of driving while under the
influence of alcohol, which was itself sufficient basis for
an exit order).