716 A.2d 1211 (1998)
315 N.J. Super. 166
STATE of New Jersey IN the INTEREST OF A.P.
Superior Court of New Jersey, Chancery Division, Family Part, Sussex County.
Decided May 22, 1998.
Bruce LaCarrubba, Sussex County Assistant Prosecutor, for the State of New Jersey.
Robert A. Mattia, Newton, for the juvenile.
GRAVES, J.S.C.
The issue presented by the juvenile's motion to suppress is whether an officer may detain a passenger, by directing him to exit the vehicle, as an escalation of a community caretaking inquiry. Given the totality of the circumstances in this case, the court is satisfied that the officer's removal of the passenger from the vehicle was not based on objectively reasonable and articulable suspicions, and the evidence seized must be suppressed.

*1212 THE FACTS

Officer Gamski, a Byram Township Police Officer for thirteen years, was the only witness to testify at the suppression hearing and the facts of the case are based on his testimony. The officer testified that the incident took place on May 21, 1997. Because the suppression hearing took place almost a year later, on May 7, 1998, Officer Gamski acknowledged the need to refer to his written report to refresh his recollection regarding specific events. He testified that at about 7:00 p.m. on May 21, 1997, while on routine patrol, he observed a motor vehicle parked in a turnout on the side of the road. The turnout is located on a rural road, in a wooded area, approximately one-tenth of a mile from the nearest residence. The Officer observed that the parked vehicle was occupied by two individuals. The driver was a young lady and the passenger was a young man. The driver was seated in the driver's seat and the passenger was seated next to her in the right front seat.
The officer testified that as he approached in his patrol car, he observed the passenger, A.P., "go forward and down." Officer Gamski positioned his patrol vehicle parallel to the parked vehicle so that he was adjacent to the passenger, and asked if everything was okay. Officer Gamski testified that the vehicle in question was parked facing the woods in a "desolate area" and he wanted to make sure that the occupants were both there voluntarily. In addition, he wanted to offer assistance if the vehicle was disabled.
In response to his general inquiry, the occupants stated that they were lost. Officer Gamski observed the passenger, A.P., making slight movements, or fidgeting, to the passenger side door and compartments thereof. Officer Gamski asked the occupants where they were coming from and A.P. indicated they had come from Tomahawk Trail, which was about two miles away. The driver was holding a folded up map and officer Gamski asked where they were going. A.P. responded that they were looking for a friend's house, and the driver said "O'Connors". While speaking with the occupants officer Gamski observed A.P. as "not making eye contact, visibly shaking and staring down and forward." Officer Gamski testified that there was nothing to indicate that either of the occupants had consumed alcohol or used any controlled dangerous substances.
Officer Gamski asked A.P. "why he motioned down and forward, forward and down" as the officer was approaching in his patrol vehicle. Officer Gamski testified that the juvenile "did not respond, he did not respond, excuse me, he responded that he did not do that or that he did not recall doing it. I do not know his exact response but he denied making that motion."
The Officer testified that at this point he began to "have a heightened awareness" for his safety, and he asked A.P. to exit the vehicle. When asked why he ordered the juvenile out of the vehicle, the officer testified to the following two reasons:
Obviously, to get him out of the vehicle and away from any object that may pose a threat to me, and to get an indication as to what was on the floor of that car and whether or not it could potentially pose any harm to me.
As the juvenile was exiting the vehicle, the Officer observed an object that was later discovered to be a lighter and a "pipe like smoking device". The objects were seized and both A.P. and the driver were placed under arrest.

THE LAW
In Maryland v. Wilson, 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997), the Supreme Court extended the rationale of Pennsylvania v. Mimms, 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), to passengers, and held that a police officer could instruct a passenger, in a lawfully stopped vehicle, to exit the vehicle. As noted in Wilson, the Court in Mimms had considered the intrusion into the driver's liberty occasioned by the officer's ordering him out of the car. The Court noted that since the driver had been validly stopped for a traffic infraction, the additional intrusion of asking him to step outside of his vehicle was "de minimis." Id. at 111, 98 S.Ct. 330. The Court then balanced this intrusion against the public interest, which includes the safety of the officer. *1213 Wilson, 519 U.S. 408, 117 S.Ct. at 885. The Court in Wilson noted that "as a practical matter the passengers are already stopped by virtue of the stop of the vehicle." Wilson, 519 U.S. 408, 117 S.Ct. at 886. Therefore, the additional intrusion upon the passenger's personal liberty is incremental and slight. Wilson noted that the potential for violence from a motorist stems from the fear that the police will uncover criminal activity, and that the "motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver." Wilson, 519 U.S. 408, 117 S.Ct. at 886. Furthermore, the Court noted that the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car." Wilson, 519 U.S. 408, 117 S.Ct. at 886. Thus, in Wilson, the Court was satisfied that directing a passenger to exit a vehicle pursuant to a lawful traffic stop was justified, because the public concern for the safety of police officers, outweighed any private liberty interests.
However, this case is significantly different than the situation in Mimms or Wilson, because Officer Gamski had no valid reason to stop and detain the occupants based on a violation of the motor vehicle laws. It is undisputed that the vehicle was legally parked on the side of the road. The officer initiated the encounter to make a community caretaking inquiry, as opposed to a lawful stop based on a traffic violation. Officer Gamski testified that during his attempt to offer assistance, he became concerned for his safety and directed A.P. to exit the vehicle. Therefore, it is clear that the encounter escalated from a community caretaking inquiry to a detention. See State v. Davis, 104 N.J. 490, 498, 517 A.2d 859 (1986).
The community caretaking function was first set forth in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The Supreme Court noted that police officers "frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Id. at 441, 93 S.Ct. 2523. Community caretaking inquiries have been classified as a "`benign' automobile stop made to assist the occupant of the vehicle if necessary." State v. Goetaski, 209 N.J.Super. 362, 365, 507 A.2d 751 (App.Div.1986).
The State relies in part on State v. Drummond, 305 N.J.Super. 84, 701 A.2d 958 (App. Div.1997), which dealt with a situation that began as a community caretaking encounter and escalated into a detention. In Drummond, the police observed a car, late at night, parked in the parking lot of a closed car wash. The car's presence was atypical for the time and location, and the officers entered the parking lot to see if the vehicle was occupied. As the officers approached, the occupants exited the car and moved towards the trunk. When questioned by the officers, one of the parties threw down a cardboard container. The container was seized and it was later determined that it contained a controlled dangerous substance. The court in Drummond considered the totality of the circumstances, and held that "it was the defendants' conduct which precipitated the measured escalation of police inquiry that led first to their temporary detention and then to seizure of the contraband in question." Id. at 89, 701 A.2d 958. The court determined that the police were reasonable in escalating the benign encounter to a detention. The court in State v. Dickey, 152 N.J. 468, 706 A.2d 180 (1998) held that if "during the course of the stop or as a result of the reasonable inquiries initiated by the officer, the circumstances `give rise to suspicions unrelated to the traffic offense, an officer may broaden [the] inquiry and satisfy those suspicions.'" Id. at 480, 706 A.2d 180, citing United States v. Johnson, 58 F.3d 356, 357-358 (8th Cir.) (quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir.1993) certif. denied, 516 U.S. 936, 116 S.Ct. 348, 133 L.Ed.2d 245 (1995)).
In State v. Smith, 134 N.J. 599, 637 A.2d 158 (1994), the New Jersey Supreme Court held that an "officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger *1214 that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." Id., at 618, 637 A.2d 158. This standard was also used in Dickey which applied Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L .Ed.2d 889 (1968), in holding that a stop must be based on "objectively reasonable and articulable suspicions." While suspicious circumstances may justifiably cause an officer to escalate a traffic stop, or a community caretaking inquiry, into an investigative detention, the reasonableness of the officer's actions depends on the totality of the circumstances present at that time, and the reasonable inferences that a trained and experienced police officer may draw from such circumstances. The court in State v. Demeter, 124 N.J. 374, 383, 590 A.2d 1179 (1991) applied this standard in holding that an officer's conclusions must be "viewed in light of his special training or experience".
Thus, the court must determine if A.P.'s actions, and responses to Officer Gamski's questions, were sufficient to warrant the juvenile's detention.
While Officer Gamski testified on direct examination that he became inquisitive and concerned for his safety because of A.P.'s movements and demeanor, Officer Gamski acknowledged during cross-examination that his written report makes no mention that he was concerned for his safety. Further, there is no evidence that the officer ever made radio contact with headquarters for a look-up or back-up. Furthermore, despite his testimony that he instructed A.P. to exit the vehicle because of a heightened awareness for his safety, he nevertheless allowed the driver to remain in the vehicle.
The actions and motions attributed to the Defendant can be classified as "furtive movements." State v. Lund, 119 N.J. 35, 573 A.2d 1376 (1990). The New Jersey Supreme Court in Lund held that "mere furtive gestures of an occupant of an automobile do not give rise to an articulable suspicion suggesting criminal activity." Id. at 47, 573 A.2d 1376, quoting State v. Schlosser, 774 P.2d 1132, 1137 (Utah 1989). In Lund the driver turned around and reached into the back seat while the officer was still in his vehicle. When questioned by the officer, who had been shot during a traffic stop a year before, the driver was nervous and "kept looking toward the back seat slightly." Lund, at 41, 573 A.2d 1376. The court held that the "record does not establish a specific particularized basis for an objectively reasonable belief that the defendants were armed and dangerous." Lund, at 48, 573 A.2d 1376. The court in Lund also cites to Spence v. State, 525 So.2d 442 (Fla.Dist.Ct.App.1988), which held that an officer's observation of the front and rear passengers leaning forward as if to place something on the ground, in a vehicle parked on a "lover's lane" known for drug use, was not grounds to order the parties out of the vehicle. Finally, Lund cites to People v. Superior Court of Yolo County, 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970), which also held that a passenger's furtive movements did not support a search. The Supreme Court of California based their decision in Yolo, in part, on the difficulty in interpreting whether the observed actions are the actions of a suspicious person, or merely the natural, innocent actions expected of a person during a police encounter. Yolo, at 822, 91 Cal.Rptr. 729, 478 P.2d 449.
The State argues that Lund also held "there are some cases in which `furtive' movements or gestures by a motorist, accompanied by other circumstances, will ripen into a reasonable suspicion that the person may be armed and dangerous." Lund, at 48, 573 A.2d 1376. One of the factors listed by the court in Lund is "lying to the police." Lund, at 48, 573 A.2d 1376. In the case at hand, Officer Gamski testified that A.P. denied making the motion that the officer testified he observed.
In In re K, 14 Cal.App.3d 94, 92 Cal.Rptr. 39 (1970), the Court of Appeals Fifth District, addressed when lying to a police officer warranted a detention. The court held that a search was justified based on the defendant's furtive movements and his subsequent denial of the actions to the police. The defendant in In re K was in a vehicle that had been pulled over, for failing to have a light on the license plate, at 8:05 p.m. As the vehicle was stopping, the officer observed the passenger "raise up and put his right hand to the top of *1215 the sun visor." Id. at 97, 92 Cal.Rptr. 39. When asked if he had hidden anything behind the visor, the defendant denied ever touching the visor. The Fifth District held the officers subsequent reaching into the vehicle and flipping down the visor was a valid search. However, in considering the totality of the circumstances, the court noted the parties had been pulled over for a valid traffic stop, that the stop took place at night, and that before questioning the defendant, the officer recognized both the driver and passenger "as persons about whom he had received reports of involvement in narcotics transactions." Id. at 95, 92 Cal.Rptr. 39. In Smith, supra, the court held that removing the passenger was justified, based on "unusual movements, the early morning hour, and a largely deserted Turnpike".
The circumstances of In re K and Smith are distinguishable from the case at hand. Officer Gamski approached the juveniles for a community caretaking inquiry, in broad daylight. Officer Gamski did not have any prior knowledge of the juveniles, and did not testify to any prior reports of criminal activity in the area. He testified that there were no signs of either alcohol or controlled dangerous substances. Officer Gamski testified that he was "dealing with two people that are possibly lost." Further, the court is presented with unclear testimony by Officer Gamski with respect to the juvenile's response to the question about leaning forward. Apparently, according to officer Gamski, A.P. at first did not respond to the question and then denied leaning forward. The issue of whether or not A.P.'s statement was a lie is subject to the same ambiguity and interpretation problems that normally accompany gestures or movements as more fully addressed in Yolo, supra. The court is not convinced that A.P.'s response to Officer Gamski, in conjunction with the juvenile's demeanor and movements, provided an objectively reasonable basis to warrant a detention.
The Supreme Court of Florida, in Popple v. State, 626 So.2d 185 (1993) dealt with an encounter similar to the case at hand. An officer investigating an abandoned stolen car saw the defendant parked in his car, four blocks from a stolen vehicle, in a desolate area. The officer approached the defendant to see if he had any information on the vehicle or if he was in need of assistance. The defendant, Mr. Popple, was legally parked and had not committed any traffic violations. As the officer approached, the defendant made several "furtive movements" and was acting nervous. Concerned for his safety the officer directed him to exit the vehicle. While the defendant was exiting the vehicle, the officer saw a cocaine pipe on the floor of the car. The Supreme Court of Florida held that the circumstances that led to the defendant's removal from the car did not warrant a reasonable suspicion on the part of the officer, and the evidence was suppressed. Id. at 188.
As indicated earlier, the court must balance the public interest against the intrusion to the private liberty of the person being detained. The court in Goetaski, cites to United States v. Dunbar, 470 F.Supp. 704 (D.C.Conn.1979), aff'd. 610 F.2d 807 (2d Cir. 1979), which held that an officer's inquiry for a community caretaking purpose should be given "extremely slight weight in balancing the public interest against the citizen's right to personal security and freedom from arbitrary interference by law enforcement officers." After considering the circumstances of the present case, the court is satisfied that the scales should tip in the favor of privacy. Officer Gamski did not have a reasonable suspicion that A.P. was armed and dangerous. The officer approached the vehicle for a community caretaking inquiry. The furtive movements and nervousness of the juvenile, even coupled with what could be considered a lie, were not an objectively reasonable basis to warrant removing A.P. from the vehicle. Therefore, the juvenile's motion to suppress is granted.