# Third District Court of Appeal

## State of Florida

Opinion filed February 8, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D22-0546
Lower Tribunal No. 21-751
_____

**R.A., a Juvenile,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Dawn Denaro, Judge.

Carlos J. Martinez, Public Defender, and Susan S. Lerner, Assistant Public Defender, for appellant.

Ashley Moody, Attorney General, and Katryna Santa Cruz, Assistant Attorney General, for appellee.

Before FERNANDEZ, C.J., and MILLER, and BOKOR, JJ.

BOKOR, J.

R.A., a juvenile, challenges her adjudication of delinquency for the offense of battery on a law enforcement officer. A charge of battery on a law enforcement officer requires that the officer engage in the lawful performance of his or her duties at the time of the battery. R.A. contends that because the officer impermissibly detained her, the officer failed to meet that predicate and the adjudication must be vacated. Because we find that the officer was engaged in a reasonable seizure at the time of the offense, we affirm.

## FACTS AND PROCEDURAL HISTORY

At approximately 9:20 PM on July 19, 2021, a Miami-Dade Police officer patrolling the Richmond Heights neighborhood of unincorporated Miami-Dade County observed R.A. sitting alone in a dark corner of a breezeway next to the entrance of BioTECH High School. The encounter occurred well after the school closed.[1] The officer, concerned by the presence of a young female alone at night, in front of a closed school in a high-crime area, approached R.A. Attempting to discern the reason for R.A.'s presence, the officer asked if she was all right, why she was there, if her parents knew where she was, and why she looked scared. R.A. responded that she was fine and not scared. However, the video evidence

---

[1] The officer testified that the school was in "our highest crime area."

2

from the officer's body-worn camera reveals a tone and tenor that belied R.A.'s representations. R.A. answered tentatively and appeared, if not scared, then, at a minimum, hesitant and unsure. The officer asked for her name and age. She responded with her name and said she was 17 years old. The officer asked if R.A.'s parents knew where she was and R.A. answered affirmatively, explaining that she'd attempted to visit a friend who lived nearby but he wasn't home.

RA claimed she was waiting for a bus home, but she took shelter in the school entryway to wait for the rain to pass. However, the officer observed that it was not raining at the time, nor had it been raining recently, and would later testify that there was "not a cloud in the sky." R.A. was carrying a face mask, but didn't have a cell phone, an ID, or a bus pass or schedule, and she didn't know which bus she was looking for or when she expected it. Nonetheless, she told the officer that she knew how to get home safely. She also said that she previously had a cell phone, but lost it a few days prior and did not remember her number. The officer then asked if R.A. wanted her parents to pick her up or send for a rideshare. R.A. explained that her parents did not have phones, that her mother did not have a car, that her father had a car but was working, and that they didn't have the money to send for a rideshare. In response to the officer's attempt to elicit

3

more vital information about her family, R.A. provided her mother's name and a partial address, but professed to not know her mother's full address (which was also R.A.'s home address).

After expressing skepticism about R.A.'s explanation and taking note of the tone, evasive and incomplete answers, and the fact that a 17-year-old could only provide such basic information, the officer asked R.A. to "wait a second" and returned to her vehicle to contact the Department of Children and Family Services. After eventually locating R.A. in their system, the officer learned that R.A. was 16, not 17, and had given an incorrect spelling of her surname. The officer also could not locate R.A.'s mother or confirm an address. The officer called for a backup unit.

After a second officer arrived, R.A. fled from the scene. The officers chased her on foot for about a block before catching her, handcuffing her, and placing her in a police vehicle. While walking back, the officer asked R.A. "what are you doing here, for real," but R.A. did not respond. The officer also explained to R.A. that "you're not in trouble" and that they were "just trying to make sure you get home safe." Approximately 35 minutes later (during which time the officers were discussing the situation and questioning

4

an unrelated older male who arrived at the scene),[2] the officers checked on R.A. to find her kicking the partition between the front and back seats of the police car. The officers then attempted to hold R.A. down and place her in leg restraints, causing her to kick at them and hit one officer in the chest.

R.A. was subsequently arrested for loitering and prowling, resisting an officer without violence, and battery on a law enforcement officer. The State declined to bring charges for loitering and prowling, but petitioned for delinquency on the battery and resisting charges. At the adjudicatory hearing, the State introduced testimony from two of the officers involved, as well as body camera footage of the encounter.

At the conclusion of the hearing, R.A. moved for a judgment of dismissal, arguing that the battery and resisting offenses occurred in the context of an illegal seizure. She argued that the officers were not engaged in the lawful performance of their duties at the time the offenses were committed, rendering the evidence sufficient only to support a lesser charge of simple battery. Conversely, the State argued that the officers were

---

[2] The questioning of the unrelated male provides a troubling footnote to this encounter. The male, in his 40s, professed to know R.A. but refused to provide any information as to why he was attempting to meet a 16-year-old female at a school after dark. While the presence of this individual had no bearing on the officer's initial suspicions about R.A., or concerns about R.A.'s safety, it does reinforce that those suspicions and concerns were well-founded.

5

properly engaged in a reasonable community caretaking function during the offenses. The trial court denied the motion and acquitted R.A. of the resisting charge, but found her guilty of battery on a law enforcement officer, expressly finding that the officers were engaged in the lawful performance of their duties at the time of the offense. R.A. now appeals, arguing that the trial court erred by denying her motion for judgment of dismissal on the battery charge.[3]

**ANALYSIS**

"The standard of review that applies to a motion for judgment of dismissal in a juvenile case is the same standard that applies to a motion for judgment of acquittal in a criminal case." X.B. v. State, 337 So. 3d 99, 101–02 (Fla. 3d DCA 2021) (quoting A.P.R. v. State, 894 So. 2d 282, 284 (Fla. 5th DCA 2005)). Accordingly, "our review of the denial of a motion for judgment of dismissal is de novo." Id. at 102 (quoting J.W.J. v. State, 994 So. 2d 1223, 1224 (Fla. 1st DCA 2008)). The purpose of a motion for judgment of dismissal is to "test[] the legal sufficiency of the State's evidence." Id. "When moving for judgment of dismissal, the movant admits

---

[3] To the extent that R.A. also argues that the evidence was insufficient to support the battery itself, the testimony of the officers and the video testimony establish that the battery occurred beyond any reasonable doubt. We therefore affirm as to that issue without further discussion.

6

the facts in evidence, as well as every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." Id. (citations omitted). Accordingly, we construe the evidence and all reasonable inferences from the evidence in the light most favorable to the State, and if we conclude that a rational trier of fact could find the existence of all elements of the offense beyond a reasonable doubt, we will sustain the conviction. Id.; see also J.W.J. v. State, 994 So. 2d 1223, 1224 (Fla. 1st DCA 2008) ("A motion for judgment of dismissal should not be granted unless there is no legally sufficient evidence on which to base a guilty verdict.").

Section 784.07(2)(b), Florida Statutes, enhances the crime of battery to a third-degree felony when committed on a law enforcement officer who is "engaged in the lawful performance of his or her duties." See also Mills v. State, 822 So. 2d 1284, 1290 (Fla. 2002) (finding that section 784.07 is an enhancement statute rather than a statute defining a new criminal offense). While the term "lawful performance of his or her duties" is not defined in the statute, the Florida Supreme Court instructs that when evaluating section 784.07, "courts must apply the legal standards governing the duty undertaken by the law enforcement officer at the point that an assault, battery, or act of violent resistance occurs." Tillman v. State, 934

7

So. 2d 1263, 1272 (Fla. 2006) (superseded on other grounds by statute, as stated in J.M. v. Gargett, 101 So. 3d 352 (Fla. 2012)).  Therefore, we must consider whether the officer legally detained R.A. in the time leading up to the battery.  See Rodriguez v. State, 964 So. 2d 833, 837 (Fla. 2d DCA 2007).

Both the Fourth Amendment to the U.S. Constitution and Article I, Section 12 of the Florida Constitution prohibit "unreasonable searches and seizures."  Accordingly, "any warrantless seizure of an individual by law enforcement officers," including those involving only "'a brief detention short of traditional arrest,'" must be "based on reasonable suspicion that the individual is engaged in wrongdoing." Caldwell v. State, 41 So. 3d 188, 195 (Fla. 2010) (quoting in part U.S. v. Mendenhall, 446 U.S. 544, 551 (1980)). "Whether a suspicion is 'reasonable' will depend on the existence of 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 21 (1968)).

A "seizure" for Fourth Amendment purposes occurs when, under the circumstances, a reasonable person would believe that they are not free to leave or otherwise terminate the police encounter.  Florida v. Bostick, 501 U.S. 429, 436 (1991).  A determination of whether a seizure occurred "is a

fact-intensive analysis in which the reviewing court must consider the totality of the circumstances." Golphin v. State, 945 So. 2d 1174, 1183 (Fla. 2006). However, "[i]t is well established that an officer does not need to have a founded suspicion to approach an individual to ask questions." Popple v. State, 626 So. 2d 185, 187 (Fla. 1993). "Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification." Florida v. Royer, 460 U.S. 491, 497 (1983).

The Supreme Court recognizes that a police officer's duties include "community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady v. Dombrowski, 413 U.S. 433, 441 (1973). Accordingly, "even without reasonable suspicion of criminal activity, a police officer may detain an individual pursuant to a community caretaking function under certain circumstances." Gentles v. State, 50 So. 3d 1192, 1199 (Fla. 4th DCA 2010) (finding that improper seizure occurred when officer performing welfare check on defendant sleeping in locked car instructed defendant to turn off engine after awakening him, as no independent basis for reasonable suspicion of criminal activity existed). Consensual "welfare checks" also fall within the community caretaking function, in keeping with "the duty of police

9

officers to 'ensure the safety and welfare of the citizenry at large.'" Taylor v. State, 326 So. 3d 115, 117 (Fla. 1st DCA 2021) (quoting in part State v. Brumelow, 289 So. 3d 955, 956 (Fla. 1st DCA 2019)). Further, "[a]sking for identification during a welfare check does not convert the consensual encounter into a seizure." Tripp v. State, 251 So. 3d 982, 986 (Fla. 1st DCA 2018).

"The touchstone of any Fourth Amendment analysis—including one involving a welfare check—is reasonableness, which is measured by the totality of existing circumstances." Taylor, 326 So. 3d at 118. Here, the officer acted reasonably from the inception of the encounter. The officer discovered R.A. alone, at night, sitting in front of a closed school located in a high-crime area—a highly unusual location for an unaccompanied minor not otherwise lost, trafficked, runaway, or engaged in criminal activity. Thus, the officer was justified in approaching R.A. to determine if she might be in danger or a danger to others, and the officer's questioning was consistent with the purpose of attempting to identify R.A. and reunite her with a guardian without preventing her from leaving. Rather than assuaging these concerns, R.A. was evasive, responding with false or incomplete information and implausible or inconsistent explanations for her presence. Her inability to accurately relay basic information about herself or her family could also have

indicated substance use or mental illness, and her one hesitant and halting statement that she was "all right" did not dispel these concerns. Thus, the officer's initial questioning, followed by leaving R.A. alone for several minutes to look up her information, was consistent with a consensual welfare check and did not rise to the level of a seizure. See id. at 119 (noting that while "[b]oth the scope and manner of a welfare check must be reasonable . . . law enforcement is not required to use the least intrusive methods available when performing community caretaking functions;" finding that officer was justified in performing welfare check on defendant who appeared to be sleeping in a vehicle at 4:30 AM with a large knife in his lap, though officer exceeded scope of welfare check when pulling defendant out of vehicle while still asleep); Brumelow, 289 So. 3d at 957 (finding that officers did not exceed permissible scope of welfare check when, finding parked car with two individuals sleeping inside, knocking on window to wake one passenger, and asking both to leave vehicle after being unable to wake other passenger; purpose of welfare check was not satisfied upon seeing that one passenger was awake, and officer reasonably believed that both may be intoxicated or experiencing medical problems).

11

After R.A. tried to flee, the officer then justifiably detained her both as a reasonable extension of the community caretaking function[4] and for reasonable suspicion of committing the offense of loitering or prowling,[5] as defined in section 856.021, Florida Statutes:

(1)   It is unlawful for any person to loiter or prowl in a place, at a time or in a manner not usual for law-abiding individuals, under circumstances that warrant a justifiable and reasonable alarm or immediate concern for the safety of persons or property in the vicinity.

(2)   Among the circumstances which may be considered in determining whether such alarm or immediate concern is warranted is **the fact that the person takes flight upon appearance of a law enforcement officer, refuses to identify himself or herself, or manifestly endeavors to conceal**

[4] Because "the scope of an encounter associated with a welfare check is limited to prevent the exception from becoming an investigative tool that circumvents the Fourth Amendment," Taylor, 326 So. 3d at 118, any alternative grounds the officer may have had to support the reasonableness of the detention here were pertinent.  Nonetheless, we agree that this detention would also have been reasonable purely as a community caretaking function, as no reasonable officer under the circumstances would have simply left R.A. to her own devices after she tried to flee.  See id. ("Without any reasonable suspicion that criminal activity is or was afoot, the welfare check should end when the need for it ends. . . . [A] welfare check, particularly one that evolves into a search and seizure, must be commensurate with the perceived exigency at hand.").

[5] The State's appellate brief relies entirely on the community caretaking doctrine to justify the detention.  While we agree that the community caretaking doctrine also provided sufficient justification, the loitering or prowling statute is directly applicable and provided an additional, and arguably more relevant, basis for the detention under the facts of this case. Moreover, so long as the trial court's ultimate conclusions are correct, we may affirm regardless of its specific reasoning.  See, e.g., Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 644–45 (Fla. 1999).

**himself or herself or any object**. Unless flight by the person or other circumstance makes it impracticable, a law enforcement officer shall, prior to any arrest for an offense under this section, afford the person an opportunity to dispel any alarm or immediate concern which would otherwise be warranted by requesting the person to identify himself or herself and explain his or her presence and conduct. No person shall be convicted of an offense under this section if the law enforcement officer did not comply with this procedure or if it appears at trial that the explanation given by the person is true and, if believed by the officer at the time, would have dispelled the alarm or immediate concern.

(emphasis added); see also McClamma v. State, 138 So. 3d 578, 585–87 (Fla. 2d DCA 2014) (explaining elements and function of section 856.021, including how "the harm to be prevented by this offense is not the possible harm to person or property," but rather "the alarm to the observer," so that "prior to the arrest, the officer is not actually determining whether the circumstances look like a possible crime in the making," but "determining whether he or she is viewing conduct that is reasonably causing the officer alarm or imminent concern that harm to person or property will likely occur in the very near future unless the officer intercedes"); D.A. v. State, 471 So. 2d 147, 154–55 (Fla. 3d DCA 1985) (emphasizing that "[l]oitering and prowling is not a catchall crime whereby a person may be charged and convicted by prosecutors when there is an insufficient basis to sustain a conviction on some other charge" and clarifying that a suspect's suspicious behavior must point to "immediate future criminal activity" rather than past

13

criminality to sustain an arrest); <u>D.L.B. v. State</u>, 685 So. 2d 1340, 1342 (Fla. 2d DCA 1996) (clarifying requirement that officer must give suspect an opportunity to explain themselves to dispel any alarm prior to arrest; noting also that "since the crime of loitering and prowling is a misdemeanor, the questionable conduct supporting the charge must have occurred in the arresting officer's presence").

Here, as discussed, R.A. was discovered alone, at night, in a high-crime area, and at a closed location where she was not supposed to be. Further, when she saw a second officer arrive, she fled. These factors, particularly R.A.'s flight from the scene after providing incorrect information and insufficient explanations, created reasonable indicia of imminent harm giving the officers probable cause to detain her.[6] <u>Cf.</u> <u>L.C. v. State</u>, 516 So. 2d 95, 96–97 (Fla. 3d DCA 1987) (finding insufficient evidence to support loitering or prowling arrest of juvenile seen walking repeatedly by closed

---

[6] Additionally, the unexplained later presence of the unrelated adult male at the scene, looking for R.A., should send a shiver down the spine of any parent, or any concerned reader. It also reinforces the reasonableness of the officer's suspicions and her actions. While we share the dissent's concern regarding the potential for abuse or scope creep of the community caretaking doctrine, this case provides no cause for concern. To the contrary, had the officer merely let R.A. on her way, one can only imagine what could have occurred. It strains credulity to think that under the circumstances of this encounter, any reasonable officer would have felt it appropriate to send R.A. on her way.

14

storefront at night where "L.C.'s explanation of his presence was reasonable and not contradicted by any fact known to the officers"); S.K.W. v. State, 112 So. 3d 775, 777–78 (Fla. 2d DCA 2013) (finding that juvenile suspects' presence near abandoned house at night in high-crime area, coupled with inability to provide full addresses, was insufficient to establish imminent threat to persons or property to support loitering or prowling arrest). The use of handcuffs and leg restraints prior to and during the arrest was also justified by the circumstances and the need to prevent R.A. from attempting to flee again. See Reynolds v. State, 592 So. 2d 1082, 1084 (Fla. 1992) ("[W]e do not find Terry and its progeny to prohibit placing a suspect in handcuffs during the course of an investigative detention where the circumstances reasonably warrant such action. If an officer reasonably believes that an investigative stop can be carried out only in such a manner, it is not a court's place to substitute its judgment for that of the officer.").

> Law enforcement, in a very real sense, fulfills a role as a "community caretaker" when they encounter truants, child runaways, children locked out of their home, and children beyond the control of their parents. They have not only the authority, but also a statutory obligation, to quickly reunite the child with their parent or guardian, or return the child to school or the appropriate agency that can provide the services needed in light of the individual circumstances.

D.O. v. State, 77 So. 3d 787, 790 (Fla. 3d DCA 2011) (Emas, J., specially concurring). Thus, because the battery here occurred on an officer in the

15

process of restraining R.A. from kicking their vehicle during a reasonable detention, we conclude that the battery occurred while the officer was engaged in the lawful performance of her duties, and we affirm the trial court's denial of the motion to dismiss and the adjudication for the offense of battery on a law enforcement officer.

Affirmed.

FERNANDEZ, C.J., concurs.

16

MILLER, J., dissenting.

In the conceded absence of reasonable suspicion or probable cause, the pursuit, apprehension, and thirty-five-minute detention of R.A. in the back of a locked police vehicle under the auspices of the community caretaking doctrine enunciated by the United States Supreme Court in Cady v. Dombrowski, 413 U.S. 433 (1973), erodes essential constitutional guarantees. Thus, I am compelled to respectfully dissent.

## BACKGROUND

The relevant facts adduced at the evidentiary hearing are undisputed. In the evening hours of July 19, 2021, R.A., then sixteen years old, was seated outside with her head down at BioTECH High School in Richmond Heights. Observing her apparent youth and gender and concerned the school was closed, a patrolling Miami-Dade Police officer approached R.A. to ascertain whether she was lost or needed assistance.

Upon questioning, R.A. confirmed she was "all right" and "not scared," and her parents were aware of her whereabouts. She told the officer she was seventeen years old and had planned to meet a friend, but he was not home, and she was taking shelter from the rain.

17

Noting it was not raining, the officer asked R.A. to spell her name and further requested her address, her method of transportation, her mother's name and date of birth, and her parents' telephone numbers. R.A. spelled her name, told the officer she planned to return to her home on a public bus, and provided the name of the development she lived in, along with her mother's name and date of birth. The officer suggested her parents should pick her up or send her an Uber. R.A. told the officer her father was working, her mother had no car, her parents could not afford an Uber, she had lost her cell phone three days earlier, and she did not have her parents' contact information.

The officer instructed R.A. to wait "a second" and returned to her patrol car. The officer then contacted the Department of Children and Family Services and, after verifying R.A.'s name, learned she was sixteen rather than seventeen years of age. The officer then requested a backup unit. When the backup officer arrived, R.A. fled on foot. Both officers pursued her for approximately a block before detaining her, handcuffing her, and placing her in the back of the patrol car.

For over a half hour, R.A. remained handcuffed and detained in the back of the car. During that time, she had no interaction with either officer.

18

After thirty-five minutes elapsed, R.A. began kicking the partition dividing the front from the rear of the vehicle. The primary officer opened the door and dragged R.A. out of the vehicle. In the process, R.A. kicked the officer in the chest. The officers then placed her in leg restraints. While she was being restrained, R.A. told the backup officer, "I wasn't doing nothing." The officer responded by admonishing her for running away. R.A. was arrested for loitering and prowling, battery on a police officer, and resisting an officer without violence.

The State took no action on the loitering and prowling charge but filed a petition for delinquency charging R.A. with battery on a law enforcement officer in violation of sections 784.03 and 784.07(2)(b), Florida Statutes (2021), and resisting an officer without violence in violation of section 843.02, Florida Statutes (2021). In the body of the petition, the State alleged that both officers were engaged in the lawful execution of a legal duty, "to wit: the detention and/or arrest of said defendant."

The trial court convened an adjudicatory hearing on the petition. At the conclusion of the hearing, R.A. moved to dismiss the petition, contending she was illegally seized and, therefore, the officer was not engaged in the lawful performance of her duties. The State argued that the seizure was authorized because the officer was performing a community caretaking

19

function.  The trial court found R.A. committed battery on a law enforcement officer but dismissed the resisting without violence count.  In doing so, the court expressly found that although R.A. was free to terminate the initial encounter, the use of force against the officer was not authorized.  The instant appeal ensued.

## STANDARD OF REVIEW

"A motion for judgment of dismissal in a juvenile case tests the legal sufficiency of the evidence presented by the State." P.B.P. v. State, 955 So. 2d 618, 620 (Fla. 2d DCA 2007).  Because this case implicates the Fourth Amendment, the evidence is viewed in the light most favorable to the State, but a de novo review of those facts is necessary to establish whether the seizure was authorized under the community caretaking function. See D.L. v. State, 138 So. 3d 499, 501 (Fla. 3d DCA 2014); Wyche v. State, 987 So. 2d 23, 25 (Fla. 2008); Harris v. State, 761 So. 2d 1186, 1188 (Fla. 4th DCA 2000).

## ANALYSIS

I. **Lawful Performance Prong of Section 784.07(2), Florida Statutes**

The outcome of this case hinges on an examination of the battery on a law enforcement officer "lawful performance" prong under section 784.07(2), Florida Statutes, in the context of the judicially created

20

"community caretaker" exception to the Fourth Amendment. Section 784.07(2)(b), Florida Statutes, reclassifies a battery committed against a law enforcement officer from a first-degree misdemeanor to a third-degree felony. This reclassification carries with it an additional element that is not present in simple battery cases. The State must prove the officer was "engaged in the lawful performance of his or her duties" at the time the battery occurred. § 784.07(2), Fla. Stat.

The phrase "lawful performance" is not statutorily defined. In this context, the Florida Supreme Court has directed us to "apply the legal standards governing the duty undertaken by the law enforcement officer at the point that an assault, battery, or act of violent resistance occurs" in evaluating the sufficiency of the evidence. Tillman v. State, 934 So. 2d 1263, 1271 (Fla. 2006). Importantly, while force is not justified in resisting an illegal arrest, an officer performing an illegal search or seizure is not engaged in "the lawful performance of his or her duties." See State v. Roy, 944 So. 2d 403, 406–07 (Fla. 3d DCA 2006); see also B.G. v. State, 213 So. 3d 1016, 1018 (Fla. 2d DCA 2017). Hence, a battery against an officer that occurs during an illegal seizure is not subject to reclassification.

II. **Constitutional Protections Against Unreasonable Seizures**

21

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  Amend. IV, U.S. Const.  Coextensively, article 1, section 12 of the Florida Constitution ensures "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures."  Art. I, § 12, Fla. Const.

These constitutional protections apply equally to minors.  See Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 74 (1976) ("Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority."); see also Breed v. Jones, 421 U.S. 519, 528–30 (1975) (applying constitutional protection of double jeopardy in context of juvenile court system); Goss v. Lopez, 419 U.S. 565, 574 (1975) ("[T]he State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969) ("First Amendment rights, applied in light of the special characteristics of the school environment, are available to . . . students.  It can hardly be argued that . . . students . . . shed their constitutional rights to freedom of speech or

22

expression at the schoolhouse gate."). Nonetheless, the age of a child subjected to a seizure is one factor to consider because "[t]he touchstone of any Fourth Amendment analysis . . . is reasonableness, which is measured by the totality of existing circumstances." Taylor v. State, 326 So. 3d 115, 118 (Fla. 1st DCA 2021).

## III. Evaluating Reasonableness

In analyzing the reasonableness of any seizure, an evaluation of "the law enforcement interest and the nature of the 'articulable facts' supporting the detention" is required. Michigan v. Summers, 452 U.S. 692, 702 (1981). This analysis necessarily entails a balancing test because, in the Fourth Amendment context, reasonableness is dependent "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). The examination is fluid and accounts for the availability, feasibility, and effectiveness of any potential alternatives to the intrusion, see Ker v. California, 374 U.S. 23, 33 (1963), and the facts are assessed not from the subjective viewpoint of the primary officer but rather "from the perspective of an objectively reasonable law enforcement officer," Tripp v. State, 251 So. 3d 982, 986 (Fla. 1st DCA 2018).

## IV. Community Caretaking Function

In the seminal case of <u>Cady v. Dombrowski</u>, 413 U.S. 433, 447–48 (1973), the United States Supreme Court recognized that police officers may, in certain circumstances, conduct a seizure within the meaning of the Fourth Amendment without reasonable suspicion or probable cause provided they are motivated by public safety concerns. In <u>Cady</u>, an off-duty Chicago police officer was arrested for driving while intoxicated following an accident. <u>Id.</u> at 436. His disabled vehicle was towed to a nearby unattended garage. <u>Id.</u> Acting under the mistaken belief that his service revolver would be in the vehicle, police officers conducted a warrantless search and found evidence of a homicide. <u>Id.</u> at 437. In examining the validity of the search, the Court observed:

> Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

<u>Id.</u> at 441. Invoking these functions, the Court concluded that the search was authorized due to the exigent need "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands." <u>Id.</u> at 443. The Court explained: "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." <u>Id.</u> at 447.

24

Over the next forty years, state and federal courts considered the breadth and scope of the community caretaking function. Some courts, including the Florida Supreme Court, construed the function narrowly, noting that the analysis in Cady "was expressly limited to the automobile context." Riggs v. State, 918 So. 2d 274, 280 n.1 (Fla. 2005). Other courts expanded its reach to warrantless residential searches, traffic stops, and protective custody seizures. See, e.g., State v. Bogan, 975 A.2d 377, 387 (N.J. 2009); State v. Pinkard, 785 N.W.2d 592, 594 (Wis. 2010); Gonzales v. State, 369 S.W.3d 851, 855–57 (Tex. Crim. App. 2012); State v. Towner, 503 P.3d 989, 996 (Idaho 2022); United States v. Quezada, 448 F.3d 1005, 1006 (8th Cir. 2006); United States v. Rodriguez-Morales, 929 F.2d 780, 785 (1st Cir. 1991).

In 2021, the United States Supreme Court was again called upon to consider the contours of the community caretaking function. In Caniglia v. Strom, 141 S. Ct. 1596 (2021), the Court was charged with considering "whether Cady's acknowledgment of [noncriminal community] 'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures in the home." Id. at 1598. Acknowledging that Cady distinguished between "a vehicle already under police control with a search of a car 'parked adjacent to the dwelling place of the owner,'" Caniglia, 141 S. Ct. at 1599

(quoting Cady, 413 U.S. at 446–47), the Court noted that the "community caretaking" quote "comes from a portion of the opinion explaining that the 'frequency with which . . . vehicle[s] can become disabled or involved in . . . accident[s] on public highways' often requires police to perform noncriminal 'community caretaking functions,' such as providing aid to motorists." Caniglia, 141 S. Ct. at 1599–1600 (alterations in original) (quoting Cady, 413 U.S. at 441). The Court further stated, "this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." Caniglia, 141 S. Ct. at 1600. Drawing on the "unmistakable distinction between vehicles and homes," the Court declined to invoke Cady to "expand the scope of . . . exceptions to the warrant requirement to permit warrantless entry into the home." Id.

In a concurring opinion, Justice Alito further clarified:

The Court holds—and I entirely agree—that there is no special Fourth Amendment rule for a broad category of cases involving "community caretaking." . . . The Court's decision in [Cady] did not recognize any such "freestanding" Fourth Amendment category. The opinion merely used the phrase "community caretaking" in passing.

Id. (citations omitted).

## V.   Public Safety and Welfare Checks

Caniglia and its progeny cast doubt on the continuing viability of the community caretaker exception outside of the vehicular context. The Florida Supreme Court, however, has separately recognized that certain exigent circumstances, including public safety concerns, may justify an otherwise unreasonable search or seizure. See, e.g., Zeigler v. State, 402 So. 2d 365, 371 (Fla. 1981); Arango v. State, 411 So. 2d 172, 174 (Fla. 1982); Richardson v. State, 247 So. 2d 296, 298 (Fla. 1971); Jones v. State, 440 So. 2d 570, 572 (Fla. 1983). In this vein, searches and seizures reasonably related in scope to routine health and welfare checks do not ordinarily run afoul of the Fourth Amendment. See Riggs, 918 So. 2d at 278; State v. Fultz, 189 So. 3d 155, 158 (Fla. 2d DCA 2016); Ortiz v. State, 24 So. 3d 596, 600 (Fla. 5th DCA 2009); Taylor, 326 So. 3d at 117; see also Caniglia, 141 S. Ct. at 1600 (Roberts, C.J., joined by Breyer, J., concurring) (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)) ("A warrant to enter a home is not required . . . when there is a 'need to assist persons who are seriously injured or threatened with such injury.'"). To be constitutionally compliant, such checks must be "divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." Cady 413 U.S. at 441; see also Matthew C. Shapiro, The Road to Fourth Amendment Erosion is Paved with Good Intentions: Examining Why Florida Should Limit the

27

Community Caretaker Exception, 6 FIU L. Rev. 351, 363 (2011) (observing a seizure under Florida's emergency aid doctrine should "be devoid of any criminal investigation"). As such, the scope of a health or welfare check must be carefully tailored to the underlying justification. Taylor, 326 So. 3d at 118 (finding the welfare check "must be commensurate with the perceived exigency at hand" and "should end when the need for it ends").

## VI. The Instant Case

In this case, the record supports the proposition that the preliminary encounter between the officer and R.A. was consensual and constituted a minimal intrusion. Although the officer was uniformed and driving a marked patrol car, she did not activate her lights or siren, physically touch R.A., brandish her weapon, or threaten arrest. Rather, she merely posed a series of questions to ascertain whether R.A. was lost or in distress. R.A. answered the questions and did not seek to terminate the encounter.

In contrast, the secondary encounter, which began with an instruction to remain in place and culminated in a chase, apprehension, restraint, and detention, was accomplished "by means of physical force or show of authority" and resembled a full-blown arrest. Florida v. Bostick, 501 U.S. 429, 434 (1991) (quoting Terry v. Ohio, 392 U.S. 1, 19 n.16 (1968)). Consequently, it constituted a seizure within the meaning of the Fourth

28

Amendment, and the narrow issue presented is whether that seizure was reasonable.

The State bears the burden of proving the seizure was sufficiently limited in scope to satisfy the Fourth Amendment.  See Florida v. Royer, 460 U.S. 491, 500 (1983).  Here, R.A. was ordered to remain in place, chased, apprehended, restrained, handcuffed, and locked in the back of a police car for thirty-five minutes.  Although a significant intrusion into liberty and privacy is inherent in any custodial detention, under these circumstances, "a reasonable [person] in [R.A.]'s position would have understood [her] situation . . . to be tantamount to being under arrest."  United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994) (internal quotation marks omitted) (quoting Berkemer v. McCarty, 468 U.S. 420, 422 (1984)).  As it did below, the State advances seven factors to justify this *de facto* arrest: (1) R.A. was alone outside of a closed school; (2) the school was located in a high crime area; (3) R.A. did not produce a cell phone; (4) R.A. did not provide her parents' contact information; (5) R.A. lied about her age; (6) R.A. did not respond to the questions clearly; and (7) R.A. fled.

Two of the factors—sudden flight and high crime area—are traditionally used in the investigative context to support reasonable suspicion or probable cause.  In this case, R.A. was arrested for loitering and prowling.

The charging document identified "detention and/or arrest" as the legal duty the officer was executing at the time the battery occurred. Yet, the State seeks to justify the seizure under the community caretaker function. The record does not reconcile this apparent incongruity, and the dangers of blurring the distinction between the two separate law enforcement functions are evident. Allowing welfare checks to serve as a mere subterfuge for criminal investigation or morph into "investigative tools that circumvent the constitutional protection against unreasonable searches and seizures," State v. Brumelow, 289 So. 3d 955, 956 (Fla. 1st DCA 2019), runs contrary to the warrant and probable cause requirements entrenched in our Fourth Amendment jurisprudence.

Regardless of this inconsistency, "the privacy interests protected by the Fourth Amendment are to be jealously guarded." Wilson v. Health & Hosp. Corp. of Marion Cnty., 620 F.2d 1201, 1209 (7th Cir. 1980). None of the factors cited by the State establish any specific, articulable threat to public safety. R.A. was not disoriented, "unresponsive, unconscious, or experiencing any sort of health emergency." Taylor, 326 So. 3d at 118. The officers did not articulate any individualized risk of harm or curfew violation.[7]

---

[7] Miami-Dade County's juvenile curfew only applies to individuals under the age of seventeen between "the hours of 11:00 p.m. until 6:00 a.m. the following day from Sunday to Thursday, and the hours of 12:00 midnight until

30

No alternative means, such as offering transportation home or summoning a social worker or medic, were engaged. In sum, the State proffered only a generalized risk of harm attendant to any minor without a cell phone outside the presence of his or her parent. A sixteen-year-old has no legal duty to carry a cell phone. Nor is an adolescent required to have constant direct parental supervision.

Against these principles, in "balanc[ing] the intrusion on the individual's Fourth Amendment interests against [the] promotion of legitimate governmental interests," the evidence in this case weighs decisively in favor of R.A. Maryland v. Buie, 494 U.S. 325, 331 (1990). To hold otherwise would all but eliminate Fourth Amendment protection for minors without any logical limiting principle.

The majority does not, however, limit its analysis to the community caretaking doctrine.[8] Instead, the majority opinion concludes that because R.A. was alone at night in a high crime area at a closed location, her subsequent evasiveness and flight "created reasonable indicia of imminent harm giving the officers probable cause to detain her." The harm was not

6:00 a.m. the following day from Friday evening to Sunday morning." Miami-Dade County, Fla., Code §§ 21-203(i), 21-204 (2021).

[8] The majority expands its reasoning beyond the seven factors advanced by the State, observing: "the video evidence from the officer's body-worn camera reveals a tone and tenor that belied R.A.'s representations."

articulated, and the State has not argued that the seizure was justified by probable cause. Of equal importance, this finding impermissibly conflates community caretaking with criminal investigation and runs contrary to a myriad of reported decisions throughout the state.[9] See Greider v. State, 977 So. 2d 789, 794 (Fla. 2d DCA 2008) (noting that "[w]hile [defendant's] conduct of sitting in an automobile with towels covering the windows is unusual and may cause an officer to be suspicious of such behavior," officer lacked appropriate legal justification to ask defendant to lower his window once it was determined defendant was "okay" and not involved in criminal activity); Taylor, 326 So. 3d at 118 (holding officer exceeded scope of

---

[9] Courts outside of this state have discussed the scope of the community caretaking doctrine in cases involving juvenile defendants. See, e.g., State v. Kinzy, 5 P.3d 668, 681 (Wash. 2000) (holding police community caretaking function did not apply where officers unlawfully detained and searched juvenile after officers observed juvenile on public sidewalk in area known for drug trafficking on a school night); City of Topeka v. Grabauskas, 99 P.3d 1125, 1131–32 (Kan. Ct. App. 2004) (holding community caretaking function ceased and did not justify detention of adult woman and juvenile sister under state law permitting police to detain child under age of 18 where police officers determined adult woman and juvenile sister did not fit descriptions of runaways); State in Int. of A.P., 716 A.2d 1211, 1211 (N.J. Ch. Div. 1998) (holding officer's removal of juvenile passenger from vehicle was escalation of community caretaking inquiry and not based on objectively reasonable and articulable suspicions); In re Kelsey C.R., 626 N.W.2d 777, 788–89 (Wis. 2001) (holding officers reasonably seized juvenile under community caretaking function where officers were determining whether juvenile was a runaway and public interest in locating runaways outweighed intrusion into juvenile's privacy right).

permissible welfare check where officer observed defendant sleeping in his car, opened defendant's vehicle door without warning, and pulled him out of vehicle while still asleep); A.J.R. v. State, 206 So. 3d 140, 145–46 (Fla. 2d DCA 2016) (holding officer not engaged in performance of legal duty where officer chased and took into custody fleeing juvenile who refused to go to school but was still in the presence of their parent); Gentles v. State, 50 So. 3d 1192, 1197–99 (Fla. 4th DCA 2010) (holding officer's direction for defendant to turn off his car's engine after observing defendant parked in mall parking lot during early morning hours escalated consensual encounter into a "seizure," which was not supported by officer's discharge of community caretaking duties); D.J.D. v. State, 143 So. 3d 1115, 1119 (Fla. 4th DCA 2014) (holding officer not engaged in community caretaker role when assaulted by juvenile after placing him in custody where juvenile was asked to leave woman's residence and did so, juvenile was then reunited with mother, and mother did not ask officers to prevent juvenile from leaving); J.H.M. v. State, 945 So. 2d 642, 645 (Fla. 2d DCA 2006) (holding officers were not in lawful execution of legal duty when juvenile pushed officer after police ordered juvenile, who was not suspected of any offense and alone babysitting smaller children, out of apartment and thereafter refused to allow juvenile to close door).

Accordingly, the finding that the officer was engaged in a legal duty at the time the battery occurred is not sustained by competent, substantial evidence, and this cause should be remanded for a reduction in charge to simple battery.